PROVIDENT LIFE AND ACCIDENT IN-
SURANCE COMPANY, Appellant,

v.

Marie HUTSON, Appellee.

No. 6126.

Court of Civil Appeals of Texas.

Beaumont.

Sept. 12, 1957.

Rehearing Denied Sept. 25, 1957.

Collins, Garrison, Renfrow & Zeleskey,
Lufkin, for appellant.

Dies, Anderson & Dies, Lufkin, for ap-
pellee.

R. L. MURRAY, Chief Justice.

This is an appeal from a judgment in the District Court of Angelina County in favor of Marie Hutson, appellee, and against the Provident Life and Accident Insurance Company, appellant.

Appellee was the wife of Albert P. Hutson and was the beneficiary in a policy of life insurance issued by the appellant on the life of Albert P. Hutson insuring him against death by accidental means. The insurance policy specifically excluded from the rights thereunder death caused directly or indirectly, wholly or partly, by medical or surgical treatments, or bodily or mental infirmity or any other kind of disease. Mr. Hutson died on May 4, 1955 while a patient at Southern Pacific hospital in Houston after doctors there performed upon him on April 29, 1955, a pneumoencephalogram.

Suit was filed on the policy and trial was had to a jury, which resulted in a verdict and judgment of liability of the appellant under the terms of the policy. After the appellant's amended motion for new trial was overruled it has duly perfected its appeal to this court.

Prior to the trial of the case on its merits the appellant presented its motion for summary judgment, which was overruled by the court. Before the cause was submitted to the jury the appellant presented its motion for instructed verdict, which was overruled.

The appellant brings its appeal under 25 points of error. The first seven points assert error by the trial court in overruling its motion for instructed verdict and in entering judgment on the jury's verdict on the grounds that there was no evidence, or insufficient evidence, to show that the insured died as a result of bodily injury due to external violent and accidental means; that there was no evidence, or insufficient evidence, that the deceased was involved in any type of accident.

Points 8 through 13 inclusive, assert that the trial court erred in overruling its motion for instructed verdict and entering judgment against it on the jury's verdict, also because there was no evidence that the pneumoencephalogram performed upon the deceased was not medical or surgical treatment; that there was no evidence showing that the death of the deceased was not caused directly or indirectly, wholly or partly, by medical and surgical treatment.

Points 14 through 18, inclusive, make similar contentions that there was no evidence, or insufficient evidence, showing that the death of the deceased was not caused directly or indirectly, wholly or partly, by bodily or mental infirmity or any other kind of disease. By points 19 and 20 the appellant complains of the trial court's refusing to define in its charge the term "medical and surgical treatment" and refusing to give its specially requested instruction in regard thereto. Points 21 and 22 complain of the trial court's definition in its charge of the term "external, violent and accidental means" and in refusing to give its specially requested instruction thereto. By points 23 and 24 appellant complains of the court's action in overruling its objection to the definition of the word "disease" as given in the court's charge, and in refusing to give its specially requested instruction in regard thereto. By point 25 it complains of the trial court's refusal to grant its motion for summary judgment, contending thereunder that the pleadings in the case, the death certificate, and the deposition of a doctor presented with the motion show that the death of the deceased was due solely to disease, or was a result of medical and surgical treatment, and was not the result of external, violent and accidental means, as a matter of law.

The facts in the case are practically without dispute, and the only question presented for determination is whether the death of the deceased came within the hazards insured against by the terms of the policy itself.

The deceased was a welder in a car shop of the T. & N. O. Railroad at Lufkin, and in May, 1953, consulted his family physician concerning trouble with his eyes. He later went to the Southern Pacific hospital in Houston where he was examined by a neurological surgeon, who later performed the pneumoencephalogram upon the deceased shortly before his death. In June, 1954, this doctor found that he was suffering from a sixth nerve paralysis and he also made a tentative diagnosis of an aneurysm. The deceased was given an arteriogram and a spinal puncture, and the results of these were negative. At that time the deceased was released from the hospital and returned to his home. He returned to the hospital April 18, 1955, and at this time Dr. Fountain's examination disclosed that he was in worse condition than when he was there in 1954. The doctor suspected a progressive lesion on the right side of the brain and performed an electro-encephalogram. This test showed some abnormality but the results were not conclusive.

█ On April 29, 1955 the doctor performed the pneumoencephalogram on the deceased in the operating room at the hospital. This was done after the deceased signed what the parties called a "surgical consent". A pneumoencephalogram consists of making a spinal puncture in the lower lumbar region of the spine while the patient is in a sitting position and is asleep under the influence of pentothal; a small amount of spinal fluid is removed and replaced with oxygen or air, which arises and enables the ventricles of the brain to be x-rayed. The results of this procedure on the deceased failed to show anything positive. From this, Dr. Fountain testified, the diagnosis was made that the deceased was suffering from a brain stem tumor.

Shortly after this was finished the deceased began to grow worse, was kept alive with artificial respiration and he developed a very high temperature. He died on May 4, 1955. An autopsy was performed, disclosing that the deceased had a brain stem tumor which was inoperable and that this tumor had hemorrhaged as a result of the pneumoencephalogram and that this was the immediate cause of death. There was evidence that such tumors will often hemorrhage following a pneumoencephalogram.

The pneumoencephalogram was performed in an effort to diagnose correctly the patient's condition and in no sense was considered by medical authorities as a treatment for the curing or alleviating the condition of a patient. It was a diagnostic test made to determine with greater accuracy the patient's physical condition, and the cause thereof.

The appellee contends in support of the judgment of the trial court that since the pneumoencephalogram was merely a diagnostic test leading up to treatment, and was not a treatment tending to cure or relieve the physical condition of a person under such circumstances, then the death of the deceased here was the immediate result of the hemorrhage caused by the pneumoencephalogram and was not death as a result of medical or surgical treatment. The appellant on the other hand points out that even though the performance of a pneumoencephalogram is characterized as a diagnostic test, it involves all the treatment and acts which have been judicially determined to be medical or surgical treatment, such as the administration of an anesthetic and the injection of a needle into the spinal column, the removal of spinal fluid and the replacement thereof by air or oxygen. Both parties have presented thorough and careful briefs on the questions involved here.

We have concluded that the appellant is correct and we hold that the performance of the pneumoencephalogram under the circumstances shown above, constitutes medical and surgical treatment, as a matter of law.

█ "The meaning of the word 'treatment' as used in the policy must be given a reasonable scope. It includes not merely the actual operation in a surgical case or the giving of a prescription in a nonsurgical case, but also the preliminary examination,

including sometimes an exploratory operation or an exploratory examination. The treatment may, and generally does, include three stages: Preliminary, main, and final. Whatever is usually done to the patient or administered to him by a skilled physician or surgeon in any one of these stages is properly included under the term 'treatment,' even though it may not be an indispensable prerequisite." Order of United Commercial Travelers v. Shane, 8 Cir., 64 F.2d 55, 59. The opinion in this case quoted from, cites and relies upon International Travelers Association v. Yates, 29 S.W.2d 980, by the Texas Commission of Appeals and Flint v. Travelers Insurance Co., Tex. Civ.App., 43 S.W. 1079. We believe that the term "medical and surgical treatment" has the legal significance and meaning, as is set out in the opinion quoted above. Within such legal meaning must be included not only what the physician or surgeon views as treatment, that is, things done in an effort to relieve or cure a physical disease or infirmity, but also all of the things performed by a doctor or a surgeon on the body of the patient in the diagnosis of or in preparation for cure. The performance of the pneumoencephalogram must be regarded, in law, as similar to an exploratory operation by a surgeon, in which he opens the body of a patient in search of the cause of his ailment, discovers an incurable ailment, and closes the incision without attempting any curative surgery. This, undoubtedly, would be surgical treatment, as a matter of law. Having reached this conclusion, we believe the trial court erred in overruling the appellant's motion for instructed verdict, in which the appellant contended that there was no evidence in the record that the death of the deceased was not caused directly or indirectly, wholly or partly, by medical or surgical treatment. The appellant's points 8 to 13, inclusive, are sustained.

In view of our conclusion that the death of the deceased was the result of medical or surgical treatment, it becomes unnecessary to discuss at length the appellant's other points.

The appellee presents a wealth of authorities and cogent argument in answer to appellant's first seven points. The death of the deceased was a result of the hemorrhage caused by the pneumoencephalogram and was unintended, unexpected and accidental, and but for such diagnostic test he would probably have lived for an indefinite time in the future. The authorities cited and quoted from by the appellee seem to support her on this very close question in this case. We overrule the appellant's first seven points.

We also overrule appellant's points Nos. 14, 15, 16, 17, and 18, which relate to its contention that the death of the deceased resulted from bodily or mental infirmity or any other kind of disease. It is true that the evidence is unquestioned that the deceased was suffering from an infirmity, which was incurable and inoperable. But there is evidence also that if the pneumoencephalogram had not been performed on him when it was performed, he would probably have lived on for an indefinite period. We overrule these points without discussion, since the judgment cannot stand for the reasons given in our discussion of other points above. The appellant's remaining points in regard to omission of definitions in the charge become unimportant here, because we believe that the appellant's motion for instructed verdict should have been granted and no special issues nor definitions were necessary to be given in the charge.

Point No. 25, in regard to the court's refusal to grant the motion for summary judgment, is overruled. The motion containing the pleadings, the death certificate and deposition of Dr. Fountain, and the answer of appellee filed thereto, all showed a probable fact question which could be determined only upon a trial on the merits, with full examination and cross examination of the witnesses.

The judgment of the trial court is reversed and judgment is here rendered that the appellee take nothing by her suit against the appellant.