Argued December 5, 1962, reversed January 16, 1963

# ZEH *v.* NATIONAL HOSPITAL ASSOCIATION

377 P. 2d 852

*Richard C. Helgeson,* Portland, argued the cause for appellant. With him on the brief were King, Miller, Anderson, Nash & Yerke and Mark C. Mc-Clanahan, Portland.

*Metta D. Baughman,* Portland, argued the cause

for respondent. On the brief were Baughman and Baughman, Portland.

Before McALLISTER, Chief Justice, and ROSSMAN, O'CONNELL, LUSK and DENECKE, Justices.

ROSSMAN, J.

This is an appeal by the defendant, National Hospital Association, from a judgment, based upon a verdict, which the circuit court entered in favor of the plaintiff. The amount of the judgment is $942.35 together with an attorney fee which was awarded under ORS 736.325. The judgment, apart from the allowance of the attorney fee, has its source in a policy of medical insurance which the defendant issued to the plaintiff July 1, 1958. Among its various provisions the policy required the defendant to pay the expenses of medical care which the plaintiff incurred for any ill health that was upon him at the time when the policy was issued provided he received no medical, surgical or hospital care for that specific condition during the first six months after the policy was issued. The complaint alleges that the

"* * * plaintiff incurred treatment for a pre-existing condition, namely, a pain in his right leg, for which condition plaintiff had not received medical, surgical or hospital care during the first six consecutive months of coverage * * *."

Judgment was demanded in the sum in which it was later entered. Although it is unimportant in this case, we add that the defendant was not required to bear the first $10 of a medical charge.

The answer admitted that the plaintiff incurred "treatment for a pre-existing condition, namely, a pain in his right leg," but denied that he "had not

received medical, surgical or hospital care during the first six consecutive months of coverage for said pre-existing condition."

From the foregoing, we see (1) that the defendant admits that it issued the policy upon which the complaint is based, (2) that both plaintiff and defendant state that when the policy was issued the plaintiff had a pre-existing condition of "pain in his right leg," (3) that the medical expense for which judgment is sought was for medical attention to the pain in the plaintiff's right leg, and (4) the defendant was required to discharge expenses incurred by the plaintiff for pre-existing conditions only if the plaintiff had not received medical, surgical or hospital care for them in the first six months after the policy was written.

The single assignment of error challenges the order which denied the defendant's motion for a directed verdict.

A copy of pertinent parts of the policy of insurance is attached to the complaint as an exhibit. From it we quote:

"Section I Benefits

"1. Medical and Surgical Services in the doctors' respective communities by duly licensed medical doctors or osteopathic physicians to be selected by Employe wherever Employe may be, and treatment by dental surgeons in cases of jaw fractures. * * *

\* \* \*

"Section II Conditions Covered

"The benefits of this contract, except as excluded hereinafter, apply as indicated to the following:

\* \* \*

"4. Pre-existing conditions for which Employe

has not received medical, surgical or hospital care during the first six (6) consecutive months of such coverage."

The word "employe" which occurs in the quoted passages refers to the plaintiff. It will be noticed that the policy covers a pre-existing condition of ill health provided the insured "has not received medical, surgical or hospital care during the first six (6) consecutive months of such coverage" for that condition. The policy in the case at bar was issued July 1, 1958. Therefore, if the plaintiff had not received "medical, surgical or hospital care" for the condition in his right leg in the period July 1, 1958, to January 1, 1959, the challenged judgment must be affirmed; but if he received, as alleged by the defendant, medical care for the condition in that period, the judgment must be reversed. That, then, is the issue before us.

In 1954 or 1955 the plaintiff noticed pain in his right leg. This was approximately three years before he obtained the policy of insurance which the defendant issued to him. About that time he consulted a physician who found a cyst on the back of his right knee. The physician inferred that the cyst was the cause of the pain and recommended treatment, but the plaintiff was skeptical and declined to go further. Later the plaintiff called upon another physician who, after examining him, gave him an injection, provided him with a belt and had a nurse apply heat treatments to him. His pains, however, continued. Both of those visits to physicians occurred before the policy was written. In the period September 18, 1958, to October 10, 1958, which was within six months after the policy of insurance had been issued, the plaintiff received from a chiropractic physician over a period of five days treat-

ments consisting of heat, massage and adjustment. They failed to improve the condition in the plaintiff's right leg.

November 17, 1958, which was also within six months of the day when the defendant issued the policy of insurance, the plaintiff called upon Dr. John Raaf, a neurologist, and explained to him the trouble which he was experiencing in his right leg. His brief states that he went to Dr. Raaf "for an examination to find out what caused the pain in his leg." The plaintiff considered Dr. Raaf very competent and went to him to learn not only what was causing the pain in his leg but also the course which he would have to pursue in order to correct it. Dr. Raaf called into the conference an associate by the name of Dr. Harold D. Paxton and shortly had Dr. Paxton make an extensive examination of the plaintiff. In describing the examination, Dr. Paxton testified:

"* * * He said he had had this for two or three years. At this time it was made worse. By the time of onset, there had been considerable activity and that had followed and consisted of a dual aching pain in the low back. If he sat for a while or where there was considerable activity, he would have this pain. If the pain became severe, that it would radiate or run, in other words, down the back part or posterior lateral aspect of the leg and go ahead as far as the foot. The principle pain or the most severe pain was in the ankle. That would occasionally go across to the top of the foot. He also said that he had a feeling of numbness on the top of the foot, and the numbness however had been intermittent. It would come and go, and all had—and was not present at all times. He described his pain as being dual, an aching. Two years prior, two years prior to this office visit which was on October 17th of 1958, he had seen an orthopedic

physician * * * who had given him a back brace to wear. This had not greatly improved his leg pain. He said that since the pain had become more severe in the back, it was perhaps less severe or more severe in the leg. It was perhaps less severe in his back. He had never had a myelogram test. He had no weakness; not made worse by coughing or sneezing. He was reasonably comfortable standing or lying; but, if he attempted to walk, the pain would become quite severe. He would then stop and rest and was somewhat improved. He said that sitting in a chair and extending his leg did not make the pain worse. The pain did not awaken him in the middle of the night. He had had an occasional pain down at the end of his spine, which is in the area known as the coccyx, but this was not severe. He had had pain of some severity every day for the past two and one-half or three years.

\* \* \*

"A Well, the only—let's see now. Yes, he said he had precordial pain, which is pain here in the chest over the past four years; and he had been, and at that time or at the beginning of this, he could scarcely walk a block without having some of the pain, and he carried nitroglycerin with him which he did not take as frequently then as in the past. Exercise would also bring on this pain. He has seen several physicians about this. That is about the only other pain."

The foregoing and other information which the plaintiff gave to Dr. Paxton constituted the history of his condition. As a witness, Dr. Paxton was asked:

"Q Now, after you concluded taking the history, did you examine Mr. Zeh?

"A Yes.

"Q What was the nature of your examination?

"A Well, we did the usual neurological examination and the general physical exams.

"Q  What does the general physical exam consist of?"

At that point Dr. Paxton, as a witness, detailed the physical examination that he made of the plaintiff. At the conclusion of the physical examination he related to Dr. Raaf his findings. Following the receipt from Dr. Paxton of the results of the examinations, Dr. Raaf conferred again with the plaintiff. According to him, "We made certain recommendations." He prescribed no medicine and no diets. Dr. Raaf testified:

"A  Well, I said that I thought he either had an arthritis of his, of the spine or that he had what we call a ruptured disc or a protruded intervertebral disc which is a piece of cartilage that occurs between each of the two vertebra and sometimes becomes dislodged and out of place and presses on a nerve that runs down the leg; and I didn't try to differentiate between those two conditions at that time because I felt that later developments, that is, conservative treatment would indicate to some extent whether it was a protruded disc; and then of course the pantopaque myelogram, which is, which is a test we use consisting of putting some oil in the spine and tipping the patient up and down the fluoroscopic table and watching that oil run, I felt that test would be the ultimate test and the final test in making the decision as to whether he had a protruded disc or not."

It is clear from Dr. Raaf's testimony that he did not have sufficient knowledge of the plaintiff's condition, as the plaintiff sat in his office, to be in a position to define with precision the cause of the plaintiff's painful condition. He deemed that the cause was concealed from his eyes by the plaintiff's flesh and bones. He thought that there were several possible causes for the plaintiff's pain, but felt so certain from the examination made of the plaintiff by Dr. Paxton aided by

his own learning as a neurologist that either arthritis of the spine or a protruded disc was the actual cause that he explained only those two to the plaintiff. As a skilled neurologist he knew the course that would have to be pursued to determine which of those causes was accountable. As we see from the testimony given by Dr. Raaf which is quoted in a preceding paragraph, he told the plaintiff that the first step is "conservative treatment," that is, traction. If it proved successful, nothing more needed to be done, but if it failed, the next step would be a pantopaque myelogram. Its nature is explained by Dr. Raaf in a preceding paragraph. A pantopaque myelogram is not a cure, it is a means whereby the physician, although unable to look through the skin, can nevertheless ascertain whether the patient has a protruded disc. If he has a protruded disc, Dr. Raaf explained to the plaintiff, surgery is necessary.

The foregoing was Dr. Raaf's verdict. He could become no more specific in the recommendations which he made until the plaintiff pursued the course of action that he placed before him. Before he could state with finality that the plaintiff's pains were caused by arthritis of the spine or by a protruded disc, the plaintiff would have to undergo traction and, if it failed to give relief, a pantopaque myelogram. Dr. Raaf referred to the recommendations which he made to the plaintiff not merely as recommendations and an opinion but also as "a differential diagnosis." He testified that he would have been unable to make his recommendations and "differential diagnosis" without the examination which was given to the plaintiff and without his conference with him. The plaintiff had a heart condition which made him fearful of surgery. Dr. Raaf testified: "It was up to him to make up his mind what

he wanted to do, whether he wanted to take our recommendation for further investigation and treatment."

After Dr. Raaf had laid out the foregoing before the plaintiff, the latter stated that he was not ready to adopt the program but that he would give it careful thought.

Dr. Raaf's charge for his service was $30. A few days after the plaintiff's consultation with Dr. Raaf he went to southern California in order to determine whether warm sunshine would improve his condition. It failed. He then returned to Dr. Raaf and on February 27, 1959, underwent traction. It did not help. The myelogram test which was then made indicated a protruded disc. April 20, 1959, surgery was resorted to and a protruded disc was removed.

We now face the question as to whether (1) the chiropractic treatment which the plaintiff received and (2) the services which Dr. Raaf performed for him constituted "medical * * * care" within the purview of the paragraph of the policy previously quoted which says that the defendant (the insurance company) is required to pay for the "medical * * * care" which is rendered to those of its insureds who have pre-existing conditions if they have "not received medical, surgical or hospital care during" the first six months of the policy. It is agreed that both the chiropractic treatment and Dr. Raaf's services were rendered within the crucial six months period. The defendant claims that both the chiropractic services and the neurological services of Dr. Raaf were medical care within the contemplation of the clause of the policy just quoted. The plaintiff argues that neither was medical care within that clause.

The plaintiff's contention that the heat, massage

and adjustment services which he obtained from a chiropractor cannot be deemed medical care is expressed as follows in his brief:

"Only duly licensed medical doctors or osteopathic physicians or dental surgeons in cases of jaw fracture are recognized and paid under the defendant's contract. This eliminated chiropractic treatments.

\*        \*        \*

"* * * ORS 684.010-990 are the sections relating to chiropractors, and ORS 684.110 prohibits any person practicing under that section from administering or writing prescriptions, from dispensing drugs, practicing optometry or naturophy [sic] or performing a major operation. ORS 677.110 sets forth the qualifications for applicants for license to practice medicine, and chiropractors could not qualify under this law to practice medicine and surgery. The defendant recognized this difference in qualifications and eliminated chiropractic treatments from its services to be paid under the policies. It would appear that defendant is carrying water on both shoulders—since chiropractic treatments could not be paid under the terms of the contract, and yet it is averring that chiropractic treatments are 'medical treatments' in order to justify denial of plaintiff's claim."

The sections of our laws which the plaintiff cites in his argument just quoted deem a chiropractor as engaged in a phase of the healing arts and require him to possess the educational and character qualifications which are exacted by those laws. They demand that before he can be granted a license to practice he must pass a written examination conducted by a board appointed by the governor of this state.

We noticed that the plaintiff received from the chiropractor heat treatments. Medical doctors at times

prescribe or administer such treatments. In fact, one of the medical doctors to whom the plaintiff resorted gave him a heat treatment. That warrants a belief that the administration of heat treatments constitutes medical care. The chiropractor also gave to the plaintiff massage treatments. Physicians frequently give or prescribe massage. Vol. 8, The Cyclopedia of Medicine, Surgery, Specialties, page 907. The chiropractor undertook hand adjustments of the plaintiff's shoulder. Treatment of that kind is at times given by physicians. Vol. 8, The Cyclopedia of Medicine, Surgery, Specialties, page 885.

The plaintiff's principal argument is not that the above treatments were not medical care, but that since the policy, in listing the medical services for which the defendant would pay, mentions only "medical doctors or osteopathic physicians * * * and treatment by dental surgeons in cases of jaw fractures," the services rendered by a chiropractor to an insured are not deemed by the policy as medical care. It will be noticed that the clause of the policy upon which the plaintiff depends does not state, at least not directly, that a chiropractor's services do not constitute medical care. The fact that the policy does not subject the defendant to payment for a chiropractor's services does not establish that the services are not medical care. The policy frees the defendant from liability for the first $10 of any medical charge even though the service was rendered by a medical doctor. If the charge was no more than $10 the defendant paid no part of it. But that circumstance does not indicate that the service was not medical care. Although we have not been informed why the policy excludes chiropractic services from the defendant's liability, it is clear that the services which were rendered to the

plaintiff by the chiropractor to whom he resorted were of the same kind that medical doctors render. In other words, had they been performed by a medical doctor they would have been deemed medical care.

We believe that the chiropractic services which the plaintiff received were medical care within the purview of the provisions of the policy which applies to pre-existing conditions, and medical care received for them within the six months period immediately following issuance of the policy.

We return now to the services performed by Dr. Raaf.

We quote the following from *Provident Life and Accident Insurance Company v. Hutson* (Texas) 305 SW2d 837:

" 'The meaning of the word "treatment" as used in the policy must be given a reasonable scope. It includes not merely the actual operation in a surgical case or the giving of a prescription in a non-surgical case, but also the preliminary examination, including sometimes an exploratory operation or an exploratory examination. The treatment may, and generally does, include three stages: Preliminary, main, and final. Whatever is usually done to the patient or administered to him by a skilled physician or surgeon in any one of these stages is properly included under the term "treatment," even though it may not be an indispensable prerequisite.' *Order of United Commercial Travelers v. Shane*, 8 Cir., 64 F.2d 55, 59. The opinion in this case quoted from, cites and relies upon *International Travelers Association v. Yates*, 29 S.W. 2d 980, by the Texas Commission of Appeals and *Flint v. Travelers Insurance Co.*, Tex. Civ. App., 43 S.W. 1079. We believe that the term 'medical and surgical treatment' has the legal significance and meaning, as is set out in the opinion quoted above. Within such legal meaning must be included not

only what the physician or surgeon views as treatment, that is, things done in an effort to relieve or cure a physical disease or infirmity, but also all of the things performed by a doctor or a surgeon on the body of the patient in the diagnosis of or in preparation for cure."

When the plaintiff called upon Dr. Raaf he was anxious to learn, if possible, the cause of the trouble in his right leg and the course of treatment which he would have to pursue to overcome it. He wanted an examination, a diagnosis, and advice as to the future.

The issue which we must now resolve is whether the following constituted medical care: (1) the examination of the plaintiff which Dr. Raaf and Dr. Paxton made, (2) Dr. Raaf's statement to the plaintiff of his findings, and (3) Dr. Raaf's recommendations to the plaintiff as to (a) the additional course which would have to be taken to determine the exact nature of the ailment in his right leg and (b) the treatment which the plaintiff would have to undergo to overcome the ailment after its precise nature was discovered.

It is true, as the plaintiff's brief states, that Dr. Raaf did not give the plaintiff any pills or other form of medication; but he resolved for the plaintiff the general nature of his ailment and what would have to be done to improve the condition.

Dr. Raaf's recommendations obviously were accepted by the plaintiff. They made such a deep impression upon him and his wife that upon their return from California the plaintiff went to Dr. Raaf and took the first measure that had been recommended, that is, traction. This was taken in a hospital and extended over a period of three or four days. When it failed to yield the desired result, the plaintiff did not abandon Dr. Raaf as he had the other practitioners

whom he had consulted in the past, but returned and had the myelogram which was the second step in Dr. Raaf's program. The myelogram indicated that the cause of the plaintiff's trouble was a protruded disc. That development confronted the plaintiff with a severe test of his allegiance to Dr. Raaf's program, for a protruded disc called for surgery and the plaintiff's impaired heart condition made him apprehensive of surgery. Nevertheless, he returned to Dr. Raaf and the specified surgery, the third and final measure that constituted a part of Dr. Raaf's recommendations, was performed.

Undoubtedly, the purpose of the policy's clause which governs this issue is a practical one. The defendant was willing to insure pre-existing conditions of impaired health if such conditions were not sufficiently acute, active, or aggravated to require a physician's aid within six months of the day when the policy was issued. Therefore, the acceptance of medical care by an insured for a pre-existing condition within six months of the issuance of the policy was made the test of liability. If the consultation with the medical man is for the purpose of medication, or of diagnosis so that he may know what he must do next, it should be deemed medical care. Services that are received from physicians within the six months period must be examined for the purpose of determining whether they were undergone because the insured's pre-existing condition was troubling him. In the present instance the plaintiff received from Dr. Raaf's office an extensive examination and at its close was given by Dr. Raaf, a neurologist in whom he had great confidence, a statement of his findings and a program to pursue in order to overcome the painful condition of which he was complaining. The plaintiff

says that Dr. Raaf did not prescribe for him any pills, medicine or a diet. That is true, but he submitted to the plaintiff a course of treatment that he would have to adopt if he was to be restored to good health. There was no alternative. Pills and medicine could not produce the desired result, but the course of medical attention, which Dr. Raaf recommended and which the plaintiff presently embraced, was the plaintiff's only hope as was demonstrated when it was put into effect. Whether Dr. Raaf's recommendations that he made to the plaintiff are termed an opinion, a recommendation, a diagnosis or a differential diagnosis is of little moment. What he said and did on October 17, 1958, brought the plaintiff mental relief, gave him hope, and constituted a program to which he yielded full allegiance and faith. We are satisfied that what took place in Dr. Raaf's office on October 17, 1958, constituted medical care.

We sustain the assignment of error and, accordingly, reverse the challenged judgment. The defendant was entitled to a directed verdict.

Reversed.