[No. 4784–9–III.   Division Three.   October 5, 1982.]

WILLIAM F. JAMISON, JR., ET AL, *Appellants*, v.
MONARCH LIFE INSURANCE COMPANY,
*Respondent*.

*Jack Dibblee,* for appellants.

*Jeffrey L. Supinger* and *Witherspoon, Kelley, Davenport & Toole,* for respondent.

MCINTURFF, C.J.—William and Alma Jamison appeal from a summary judgment granted in favor of Monarch Life Insurance Co. (Monarch).

The Jamisons were insureds of Monarch. On May 16, 1975, Mrs. Jamison had congestive heart failure and underwent open heart surgery to correct a dysfunctional mitral valve caused by childhood rheumatic fever. Her natural valve was replaced with a Bjork–Shiley prosthetic valve. Thereafter, she resumed normal activities but continued to take certain medication and remained under the medical supervision of her family physician and her cardiologist.

Her family physician monthly tested Mrs. Jamison's blood coagulation rate and occasionally modified the dosage of her medication.[1]

On November 15, 1978, she consulted her family physician, complaining of breathing difficulty. She was diagnosed as having bronchial pneumonia but did not respond to treatment. Dr. Henry Lang, her cardiologist, determined that the artificial heart valve was not functioning properly and Mrs. Jamison again underwent surgery to replace her failed valve with a porcine artificial mitral valve. Her recovery was normal.

In 1975, Monarch paid $13,750, the maximum benefits available for any one continuous period of treatment under the policy. Mrs. Jamison submitted an insurance claim to recover costs and medical expenses incurred during the 1978 hospitalization. Monarch denied the claim, maintaining it had already paid all policy benefits available for one continuous period of treatment. The trial court determined there was no ambiguity in the policy and that Mrs. Jamison was under continuous medical care for her first mitral valve replacement between 1975 and 1978, and determined as a matter of law that she was within a continuous period of treatment for her illness as defined in the policy.

Mrs. Jamison essentially contends that although she was on medication for 3½ years prior to her 1978 hospitalization, she continued normal activities, and insists that periodic visits to her family physician for the monitoring of an existing condition does not constitute a continuous period of treatment.

■ The objective of summary judgment is to avoid a useless trial. *Lamon v. McDonnell Douglas Corp.*, 91 Wn.2d 345, 349, 588 P.2d 1346 (1979). The burden is on the party moving for summary judgment to demonstrate the nonexistence of any genuine issue of material fact; if the party does, that party is entitled to judgment as a matter of law.

---

[1] Mrs. Jamison's medication included an anticoagulant for her blood and a heartbeat stabilizer.

*Ohler v. Tacoma Gen. Hosp.*, 92 Wn.2d 507, 511, 598 P.2d 1358 (1979); *see also* CR 56(c). A material fact is one upon which the outcome of the litigation depends. Affidavits, depositions and all other testimonial documents of the moving party must be scrutinized with care and all reasonable inferences from the evidence must be resolved against the movant. *Lamon, supra.* An appellate court must make the same inquiry as the trial judge. *Fahn v. Cowlitz Cy.*, 93 Wn.2d 368, 373, 610 P.2d 857 (1980).

Part 2 of the Monarch policy defines "period of treatment" as follows:

> [A]ny period during which the Insured, as a result of such sickness or such injuries, is under the care and attention of a licensed physician other than himself or his spouse, son, or daughter, . . .

The remaining pertinent part of the Monarch policy is as follows:

> Part 4. Recurrent Periods of Treatment.
> If, *following a period of treatment* with respect to which indemnity is payable under this policy, the Insured shall engage in the normal activities of a person of like age and sex for a continuous period of 6 months or more, any subsequent period of treatment *resulting from or contributed to by the same cause or causes* and which commences while this insurance is in force shall be considered a new period of treatment and shall be subject to a new Deductible Amount and to the limits applicable to one continuous period of treatment, *but if said period during which the Insured shall engage in such normal activities is less than 6 months, such subsequent period of treatment commencing while this insurance is in force shall be deemed a continuation of the preceding period* and the Company's liability for the entire period, including such preceding period of treatment, shall be subject to the limits stated in Part 3.

(Italics ours.)

▆ It is uncontroverted that the applicable provisions of the Monarch policy were explained to the Jamisons. The affidavit of Ted Schrenk, a Monarch agent, states:

> I explained to the Jamisons that in order to start a new

period of coverage for the same condition that six (6) months must elapse in which Mrs. Jamison was normally active and, further, *that she must not be treated on a regular basis for her condition by any physician.*

(Italics ours.) Mrs. Jamison was under doctor's orders to continually treat, check and monitor her post–1975 medical situation to avoid clogging of the artificial valve. The period of treatment as defined in the policy applies to this situation. The expression "medical treatment" includes acts done by a physician in follow–up care. 1A J. Appleman, *Insurance* § 426 (1981). Mrs. Jamison was under continuous medical care[2] of at least two physicians from May 1975 through November 1978. Dr. Lang's affidavit is noteworthy:

> Mrs. Jamison's post–operative course was essentially uncomplicated and she was restored to normal activities. She was followed periodically until November 15, 1978, when she was referred with a diagnosis of pneumonia and *demonstrated findings of congestive failure and prosthetic mitral valve malfunction.* She underwent replacement of the original Bjork–Shiley valve with insertion of a porcine mitral valve. Subsequent to the second valve replacement, she has done well.
>
> The initial operation was performed to relieve mitral stenosis caused by childhood rheumatic fever. *The second operation was performed to replace a malfunctioning artificial mitral valve. . . .* The abnormal valve removed demonstrated clot formations with fibrous tissue ingrowths which interfered with its function.

(Italics ours.)

Part 4 of the policy, relied upon by Mrs. Jamison, states that a recurrent period of treatment must "follow a period of treatment with respect to which indemnity is payable." Additionally, the policy notes that any subsequent period of treatment must not be one "resulting from or contrib-

---

[2]The term "medical care" has been defined by our sister state of Oregon as follows: "If the consultation with the medical man is for the *purpose of medication,* or of diagnosis so that he may know what he must do next, it should be deemed medical care." (Italics ours.) *Zeh v. National Hosp. Ass'n,* 233 Or. 221, 234, 377 P.2d 852, 858 (1963); *see also Aetna Life Ins. Co. v. Scarborough,* 556 S.W.2d 109, 111 (Tex. Civ. App. 1977).

uted to by the same cause or causes" which caused the continuous period of treatment. Dr. Lang's affidavit indicates the second operation and subsequent hospitalization "was performed to replace a malfunctioning artificial mitral valve."[3] Therefore, the second operation in whole or in part resulted from or was contributed to by the original implant. Although Mrs. Jamison may have been hospitalized for suspected pneumonia, her hospitalization resulted, at least in part, from "congestive failure and prosthetic mitral valve malfunction."

Viewing the record in a light most favorable to Mrs. Jamison, we find no genuine issues of material fact. The policy is clear and unequivocal in the present situation, *i.e.,* if there was a previous condition which had been under continuous treatment, as a concurring cause, there was no coverage. Her second hospitalization followed a continuous period of treatment after her first hospitalization. Nothing demonstrates the second mitral valve replacement did not result from, or was not contributed to by, causes which initiated the treatment in 1975.

The judgment of the Superior Court is affirmed.

GREEN and ROE, JJ., concur.

---

[3]When asked if pneumonia was a cause of the malfunction of the mitral valve, Dr. Lang responded:

"A. Probably not, at least to my knowledge pneumonia is not a cause of valve malfunction per se."