Douglas W. Curry, M.D., Appellant, v. State of Nebraska ex
rel. Donald Stenberg, Attorney General, et al., Appellees.

496 N.W.2d 512

Filed March 5, 1993.   No. S-92-051.

Robert B. Creager, of Berry, Anderson, Creager &
Wittstruck, P.C., for appellant.

Don Stenberg, Attorney General, and Melanie J.
Whittamore-Mantzios for appellees.

Robert T. Grimit, of Baylor, Evnen, Curtiss, Grimit & Witt,
for amicus curiae Ken Kester, R.P.

Hastings, C.J., Boslaugh, White, Caporale, Shanahan,
Fahrnbruch, and Lanphier, JJ.

Caporale, J.

Pursuant to the provisions of Neb. Rev. Stat. § 71-150

(Reissue 1990), the defendant-appellee, State of Nebraska, through its Attorney General, brought a proceeding before the Director of its Department of Health to discipline the plaintiff-appellant, Douglas W. Curry, M.D. The director found that Curry had engaged in unprofessional conduct, in violation of Neb. Rev. Stat. § 71-147(10) (Reissue 1990), and as a consequence restricted his medical practice in a variety of respects for a period of 1 year, required him to take additional training, and placed him on probation for a period of 2 years following the period of restriction. Upon appeal by Curry, the district court affirmed the director's order. On appeal to this court Curry asserts, among other things, that the district court erred in failing to find that, as interpreted, the relevant statute is unconstitutionally vague. A preliminary aspect of that assertion of error having merit, we reverse and remand with the direction that the district court reverse the director's order and command dismissal of the cause.

After the health department received information that Curry, a licensed physician, may have been prescribing medication for other than legitimate medical purposes, an investigation was launched. Two health department investigators visited Curry under assumed identities and posed as patients.

On his initial visit to Curry, the first investigator represented that he was a runner training for a marathon and was experiencing a lack of "mental energy to stay with" his effort to increase his running from 65 to 85 miles per week. He expressed the hope that something might be done about it, and said he knew a few runners who told him they took "speed" and that a couple of them had given him a substance which he described. He denied having any other problems, but Curry noted that the investigator's blood pressure was elevated (Curry's nurse had measured it at 160/90) and inquired if the investigator knew what it was when it was last checked. The investigator claimed that he periodically checked his own blood pressure and that it usually read 120/80. Curry said he did not "suppose that a short term thing, if that's all you're using it for would create any significant problems, as long as that's all it is is a short term thing." Curry explained that by short term he meant a month,

and wrote a prescription for 30 5-milligram tablets of Dextroamphetamine, to be taken each evening. Dextroamphetamine is a type of amphetamine, a controlled substance under Neb. Rev. Stat. § 28-405 [Schedule II] (c) (Reissue 1989).

This same investigator returned to Curry 16 days later, at which time his blood pressure was measured by Curry's nurse as being 120/80, but which Curry's chart shows as reading 140/80. In any event, the investigator represented that he was running short of the prescription, as he had started working out twice a day two or three times per week. Curry said he "could try giving [the investigator] a few more and see how things go," but commented that he did not "think [it is] a good idea to get into a long term habit of trying to keep things going by using some speed. . . ." He then wrote a prescription for 30 more 5-milligram tablets of Dextroamphetamine, to be taken one tablet each evening before running.

On this investigator's third trip to Curry, his blood pressure measured 160/90. The investigator told Curry he had reduced his training schedule for the last 20 days or so but had recently resumed training. Upon Curry's agreement to prescribe more Dextroamphetamine, the investigator explained that because of the hot weather, he was running later in the evening and was having trouble "winding down," claiming that it was often 2 in the morning before he could relax enough to sleep. He asked for "something to take the edge off." Curry prescribed 30 more 5-milligram tablets of Dextroamphetamine, to be taken each evening before running, and 30 30-milligram doses of Dalmane, a trade name for flurazepam, a controlled substance under § 28-405 [Schedule IV] (a)(10).

On his fourth and final encounter with Curry, the investigator represented that although he liked the speed, he did not care for the Dalmane much, as it "worked too good sometimes because it made it difficult in the morning and it kind of seems to have a long lasting" effect. The investigator asked if Valium would be better, and Curry explained that Valium is a mild tranquilizer and might not be enough and that he would try switching to something different. The investigator then asked about getting a prescription for more than a 30-day supply, as the appointments took so much time from his work

schedule. Curry agreed and prescribed 60 5-milligram Dextroamphetamine tablets, to be taken each evening before running, and 30 .25-milligram doses of Halcion, a trade name for triazolam, a controlled substance under § 28-405 [Schedule IV] (a)(45). The investigator also inquired whether anyone he had referred had been in. When Curry responded negatively, the investigator said he had given some of his Dextroamphetamine to a "couple of guys" he ran with, telling them he had gotten the tablets from Curry, and that he thought they were going to call Curry for an appointment.

The second investigator then made an appointment and went to see Curry. After Curry's nurse recorded his height, weight, pulse, and blood pressure, which measured 140/98, the investigator told Curry that he was referred to him by the first investigator, describing him as a friend with whom he ran and who had given him a couple of "pills," which had helped him keep up. The investigator explained that although he was not training to run a marathon, he ran between 3 and 7 miles per run, usually three times per week. Curry noted that the investigator's blood pressure was a little high and asked if that was normal for him or if there was a history of high blood pressure in his family. The investigator replied that he did not know what his blood pressure usually measured and denied a family history of high blood pressure. Curry then advised the investigator to have his blood pressure checked periodically and that if it was consistently above 140/90, he might need treatment. Curry also explained that he was "not real gung ho" on Dextroamphetamine but supposed it was "no big deal" if one took it two or three times a week to "help with the work out for a little bit." He would not suggest its use on a regular basis, but "for a couple of months [it is] really not any big deal," remarking that its use tends to elevate blood pressure and that the investigator's already looked a little suspicious, but that a few could be tried for awhile. The investigator then asked if he could be given a few extra pills so that he could give part of the prescription to his wife for use as diet pills. Curry replied that he could give him a few, "but generally speaking if she'd want something to help her with diet she probably ought to be seen rather than just giving you, giving you a bunch of tablets."

Nonetheless, Curry issued a prescription for 30 5-milligram tablets of Dextroamphetamine, to be taken one tablet "3-4 days weekly before running."

A board-certified specialist in internal medicine testified that the accepted indications for use of amphetamines are for narcolepsy and attention deficit disorder. He was of the view that a prescription for any other reason would be contra-indicated and that the presence of an elevated blood pressure constituted a specific contraindication. This witness further opined that it constitutes unprofessional conduct to prescribe Dextroamphetamine for the purpose of training for a marathon run. The repeated prescription of the drug before the first supply should have been consumed and later after the patient represented that he had shared the drug with another also constituted unprofessional conduct. For all a physician would know, the patient was taking more of the drug than prescribed. Whether the patient took more of the drug than prescribed or whether he shared it with another, the drug was being used inappropriately. Additionally, the prescription of Halcion and Dalmane to counteract the effects of the amphetamines added to the impropriety of Curry's prescriptions to the first investigator.

In this witness' opinion, a reasonably prudent physician in prescribing a drug would not rely solely on the indications and contraindications listed in the Physicians' Desk Reference, since the reference is "put out by the drug manufacturers." Although the reference listed weight control as an indicated use for amphetamines, the witness was of the view that its use for such purpose is not appropriate. However, without more, prescription of the product for such a program would not be unprofessional conduct. This witness also testified that a contraindication for the use of a particular drug does not per se preclude its prescription; in making a prescription decision, a physician must weigh the benefits of a drug against its detriments.

A physician board certified in family practice was of the opinion that the indications for use of Dextroamphetamine are as an appetite suppressant employed in conjunction with a diet program and counseling by the physician, narcolepsy, and

hyperkinetic syndrome, also known as hyperactive child syndrome. Contraindications include cardiovascular heart disease, hypertension, or a known sensitivity to the drug.

This physician was of the view that it is unprofessional conduct to prescribe Dextroamphetamine to a runner for the purpose of training for a marathon and to prescribe Dalmane and Halcion to a runner. He agreed that a contraindication to the use of a particular drug is not an absolute prohibition against its use; rather, a physician must, in making a prescription decision, weigh the advantages and disadvantages of using a particular drug. This witness was not aware of any publication or treatise declaring that Dextroamphetamine cannot be prescribed to enhance athletic performance. However, he was of the opinion that when a patient requests a specific drug which is a controlled substance, the physician should suspect drug abuse.

On the other hand, a surgeon whose practice includes vascular, noncardiac thoracic, and general surgery expressed the opinion that while "reasonable physicians, under similar circumstances might disagree over the decision of . . . Curry to prescribe Dextroamphetamines, even in low dosages, for enhancing a patient[']s ability to train for athletic endeavors . . . Curry's treatment under the circumstances" did not constitute unprofessional conduct.

With those facts in mind, we turn our attention to the language of § 71-147, the statute under which the proceedings against Curry were brought. It provides that a "license or certificate to practice a [health] profession may be . . . limited, revoked, or suspended, or have other disciplinary measures taken against it . . . when the . . . licensee . . . is guilty of any of the following acts or offenses." Among the 17 acts or offenses then enumerated is subdivision (10), which reads: "unprofessional conduct, which term includes all acts specified in section 71-148 and such other acts as may be defined in rules and regulations adopted and promulgated by the board of examiners in the profession of the . . . licensee . . . with the approval" of the health department.

Neb. Rev. Stat. § 71-148 (Reissue 1990) reads: "For the purpose of section 71-147, unprofessional conduct shall include

any of the following acts," trailed by 15 defining clauses, none of which deal with the prescribing of drugs. However, two of the 17 acts or offenses proscribed by § 71-147 do relate to the prescribing of drugs: Subdivision (13) punishes the "distribution of . . . controlled substances, or drugs for any other than lawful purposes"; subdivision (17) punishes "acts or offenses for which disciplinary measures may be taken against a registration for controlled substances under" other Nebraska statutes.

The State acknowledges that neither § 71-148 nor the rules and regulations concerning the practice of medicine

> specifically state that prescribing controlled substances for other than medical purposes; continuing to prescribe a controlled substance after the patient is taking more of the controlled substance than instructed and sharing the controlled substances with others; and prescribing controlled substances to counter the effects of the first controlled substance prescribed is unprofessional conduct.

Brief for appellee at 22. However, in reliance upon the presence of the word "includes" in the statute, the State claims that § 71-147(10) is a broad, inclusive law which embraces Curry's conduct as unprofessional conduct because it violated the practice standards of the medical profession.

Although Curry phrases his concerns in constitutional terms, the threshold question is whether § 71-147(10), as expanded by the provisions of § 71-148, encompasses Curry's conduct. As a question of statutory interpretation, the matter is one of law in connection with which we as an appellate court have an obligation to reach an independent conclusion, irrespective of the determination made by the court below. *Calvert v. Roberts Dairy Co., ante* p. 664, 496 N.W.2d 491 (1993); *FirsTier Bank v. Triplett, ante* p. 614, 497 N.W.2d 339 (1993); *Speidell Monuments v. Wyuka Cemetery, ante* p. 134, 493 N.W.2d 336 (1992); *In re Interest of Powers, ante* p. 19, 493 N.W.2d 166 (1992).

In determining the meaning of a statute, we must determine and give effect to the purpose and intent of the Legislature as ascertained from the entire language of the statute considered in its plain, ordinary, and popular sense, it being our duty to

discover, if possible, the Legislature's intent from the language of the statute itself. *In re Interest of Powers, supra.* Moreover, in the absence of anything indicating to the contrary, statutory language is to be given its plain and ordinary meaning; when the words of a statute are plain, direct, and unambiguous, no interpretation is necessary or will be indulged to ascertain their meaning. *State v. Chambers, ante* p. 124, 493 N.W.2d 328 (1992). Additionally, when considering a series or collection of statutes pertaining to a certain subject matter which are in pari materia, they may be conjunctively considered and construed to determine the intent of the Legislature, so that different provisions of the act are consistent and sensible. *In re Interest of Powers, supra.*

With those general rules in mind, we revisit the language of the pertinent statutes. As noted earlier, § 71-147 enumerates, in subdivisions (13) and (17), two specific drug-related activities which subject a licensed health care provider such as Curry to discipline. We are not unaware of the rule of construction which provides that a statute which specifies the object of its operation excludes therefrom every object not expressly mentioned (expressio unius est exclusio alterius). *State Bd. of Ag. v. State Racing Comm.*, 239 Neb. 762, 478 N.W.2d 270 (1992); *Nebraska City Education Assn. v. School Dist. of Nebraska City*, 201 Neb. 303, 267 N.W.2d 530 (1978); *School District of Omaha v. Adams*, 151 Neb. 741, 39 N.W.2d 550 (1949). However, the fact that those two specific drug-related activities are specifically covered by § 71-147 does not, in and of itself, necessarily mean that other and different drug-related activities cannot come within the purview of another and more general provision of the statute. Thus, we come to the language of § 71-147(10), permitting the imposition of discipline for unprofessional conduct which "includes all acts specified in section 71-148 and such other acts as may be defined in rules and regulations adopted and promulgated" as therein specified.

The State in effect argues that because § 71-147 contains the word "includes," one can look to the practice standards of the medical profession to determine what constitutes unprofessional conduct notwithstanding that § 71-147(10) specifies the

sources to which one is to look in order to determine that fact. The State's contention, however, overlooks that the special provisions of a statute in regard to a subject will prevail over the general provisions in the same or other statutes. *Glockel v. State Farm Mut. Auto. Ins. Co.*, 219 Neb. 222, 361 N.W.2d 559 (1985), *appeal after remand* 224 Neb. 598, 400 N.W.2d 250 (1987); *Kibbon v. School Dist. of Omaha*, 196 Neb. 293, 242 N.W.2d 634 (1976); *Mancuso v. State*, 123 Neb. 204, 242 N.W. 430 (1932). Thus, the word "includes" is restricted by the language which specifies the sources to which one is to refer in order to determine what constitutes unprofessional conduct, to wit, § 71-148 and rules and regulations which were never adopted. Obviously, unadopted rules and regulations cannot define anything, and § 71-148 does not deal with the prescription of drugs. Thus, a violation of the practice standards of the medical profession does not define unprofessional conduct for the purposes of § 71-147(10).

It is true that in *Scott v. State ex rel. Board of Nursing*, 196 Neb. 681, 244 N.W.2d 683 (1976), under a statute which empowered the Board of Nursing to deny a license to one "guilty of unprofessional conduct," we held that what constituted such conduct could be established by the testimony of qualified experts. However, the relevant statute in *Scott*, Neb. Rev. Stat. § 71-132.29 (Cum. Supp. 1976), did not restrict the meaning of unprofessional conduct to definitions contained in specifically named sources, as does § 71-147(10); thus, the State's reliance upon *Scott* is misplaced.

Because § 71-147(10) does not encompass Curry's conduct, we do not reach the constitutional concerns he has raised. Neither are we confronted with the need to determine whether the Legislature has properly set the standards and limits within which the rulemaking bodies are to act.

REVERSED AND REMANDED WITH DIRECTIONS.