REQUESTED BY: Senator Don Wesely, Chairperson Health and Human Services Committee Nebraska State Legislature
OPINION REQUEST:
LB 146 would change the Nebraska statutes stating the grounds for disciplining licenses of health care professionals. LB 146 would amend the disciplinary statutes by adding the following language:
 This section shall not be construed to affect or prevent a licensee's use of whatever medical care, conventional or nonconventional, which effectively treats human disease, pain, injury, deformity, or physical condition which is within the scope of practice of the licensee.
In your opinion request, you express the concern that the bill will weaken the ability of examining boards and our office to regulate unproven therapies. Your opinion request specifically seeks our opinion "concerning the legal effect of adding this new language in cases involving discipline of health care professionals".
CONCLUSIONS:
 1. As drafted, LB 146 would inject legal ambiguity into the statutory grounds for disciplining professional health care licenses.
 2. As drafted, LB 146's legal ambiguity can allow licensed health care professionals to promote and use unproven therapies with less risk of disciplinary consequences.
Legislative history:
Neb. Rev. Stat. §§ 71-147 and 71-148 state the many grounds for disciplining the licenses of health care professionals. LB 146 proposes to amend both Sections 71-147 and71-148 by adding the language stated above.
The disciplinary grounds provided by Sections 71-147 and71-148 apply to multiple licensed health professions and occupations, not simply those professionals having a license to practice medicine and surgery. These disciplinary statutes are also applicable to licensed professionals such as advanced registered nurse practitioners, nurses, certified nurse practitioner-anesthetists, certified nurse midwives, athletic trainers, chiropractors, dentists, dental hygienists, massage therapists, medical nutrition therapists, mental health practitioners, nursing home administrators, optometrists, osteopathic physicians, pharmacists, physical therapists, podiatrists, psychologists, and respiratory therapists.
As recognized by the Nebraska Supreme Court, the purpose for licensing and disciplining health care professionals is for the protection of the public. Using the Supreme Court's terminology from last century, "The purpose . . . was to protect the sick and afflicted against the knavery of quacks. . . ." Maxwell v.Swigart, 48 Neb. 789, 791, 67 N.W. 789, 790 (1896). Using the Supreme Court's more recent terminology, "The disciplinary proceedings of physicians . . . serve the same purpose: protection of the public interest." Davis v. Wright,243 Neb. 931, 939, 503 N.W.2d 814, 819 (1993).
In reviewing the history of Section 71-147 and 71-148, it is noted that significant amendments were made to these statutes in 1993 by the Legislature in response to the Nebraska Supreme Court's decision in Curry v. State ex rel. Stenberg,242 Neb. 695, 496 N.W.2d 512 (1993). The Curry case involved a physician who had been disciplined for "unprofessional conduct" for prescribing controlled substances contrary to practice standards of the medical profession. The Nebraska Supreme Court reversed the discipline on the basis that Neb. Rev. Stat. §§ 71-147 and71-148 did not define "unprofessional conduct" to include a professional's violation of the practice standards of his own profession.
Two months after the Curry decision, the Legislature adopted Amendment 2051 to Laws 1993, LB 536, which was ultimately passed by the Legislature by a vote of 44 to 1 with the emergency clause and approved by the Governor on June 10, 1993. Amendment 2051 amended Section 71-148's definition of "unprofessional conduct" and added the following language:
 unprofessional conduct shall mean any departure from or failure to conform to the standards of acceptable and prevailing practice of a profession or occupation or the ethics of the profession or occupation, regardless of whether a person, patient, or entity is injured, or conduct that is likely to deceive or defraud the public or is detrimental to the public interest, including, but not limited to:
 [Subsections 1 through 16, stating various disciplinary violations, remained unchanged. Subsections 17-21 were added to create new violations relating to sexual misconduct, failure to maintain treatment records, and drug prescribing violations.]
Analysis of LB 146:
There are several key terms of LB 146 which are not defined by the bill. They are the terms "effectively treats", "conventional or nonconventional", and "medical care".
The terms "conventional or unconventional", in the context of the bill's remaining language, indicate that the ultimate question to be considered in disciplining licensed health care professionals for providing medical care is the effectiveness of "whatever medical care". One can obviously note that the proof of anything is in the pudding. However, trying to prove at a disciplinary hearing what was in the pudding, after the fact, may be extremely difficult.
The bill is unclear who will have the burden of proving effectiveness or how such matters are to be proven. In Davis v.Wright, 243 Neb. 931, 503 N.W.2d 814 (1993), the Nebraska Supreme Court ruled that the State has the burden of proving disciplinary violations by clear and convincing evidence, which is a heavier burden of proof than is imposed on a civil litigant in malpractice litigation. Thus, the question of who would have the burden of proving "effectiveness", or lack of the same, in a disciplinary proceeding is a significant question, especially if the burden of proof in this regard is to be on the State.
The question of how to prove "effectiveness" is troublesome when legal concepts of admissible evidence are contrasted with the bill's use of the adjective "unconventional" in reference to "medical care". Neb. Rev. Stat. § 84-914 (1) provides that any party to an administrative hearing may require an administrative agency to be bound by the rules of evidence. Since professional disciplinary proceedings are administrative hearings, either the State or the licensed professional may invoke the rules of evidence for a contested disciplinary hearing. If proof of effectiveness of medical care is to be by expert testimony, the Nebraska Supreme Court applies the standard for the admissibility of scientific evidence first enunciated inFrye v. United States, 293 F. 1013 (D.C. Cir. 1923). See, Statev. Reynolds, 235 Neb. 662, 457 N.W.2d 405 (1990); State v.Carter, 246 Neb. 953, 524 N.W.2d 763 (1994). The Nebraska Supreme Court has explained the "Frye" test as follows:
 Under the test or standard enunciated in Frye, reliability for admissibility of an expert's testimony, including an opinion, which is based on a scientific principle or is based on a technique or process which utilizes or applies a scientific principle, depends on general acceptance of the principle, technique, or process in the relevant scientific community. State v. Reynolds, 235 Neb. at 681, 457 N.W.2d at 418. Emphasis added.
In accordance with the Nebraska Supreme Court's decision inReynolds, the rules of evidence appear to forbid the introduction of expert testimony that something which is "nonconventional" was "effective". This is because the expert's testimony would be unreliable if the scientific principles upon which the care was based are not generally accepted in the relevant scientific community. LB 146 is unclear whether it would have the effect of permitting "unreliable experts", i.e. those defined by evidence rules as experts whose techniques are not generally accepted, to testify as to the effectiveness of nonconventional medical care.
Whether anecdotal testimonials of effectiveness, as opposed to expert testimony, will suffice to establish effectiveness is an open question. Obviously, a patient can testify to the treatment provided and the effects noticed by the patient. If such evidence will be sufficient to insulate a professional from discipline, one can envision claims that a certain flu remedy was effective because, after administration of it, the patient's symptoms generally disappeared after 5 to 7 days.
The ambiguity of the term "effectively treats", as it refers to the bill's language on "human disease, pain, injury, deformity, or physical condition", raises legal questions beyond that of the burden of proof and who has the burden. Also unclear is what happens if the "medical care" in a particular fact situation is "effective" to treat a patient's particular complaint, such as pain, but creates other complications or conditions. For example, one could prescribe pain medication or a variety of treatments which may be "effective" to relieve pain or a particular patient complaint, but which can also cause other complications or fail to address other underlying problems.
The term "medical care" would not necessarily be restricted to care provided by those licensed in the profession of medicine and surgery. As previously noted, there are numerous other professions which are subject to the disciplinary provisions of Sections 71-147 and 71-148, many of which also are responsible for providing what could be construed as "medical care" for humans. See also, Champion Intern. v. Nicholes, 773 P.2d 376
(Okla.App. 1989 — psychologist's services constitute "medical care"); Zeh v. National Hospital Ass'n, 377 P.2d 852
(Ore. 1963 — chiropractor's services constitute "medical care").
The bill as a whole is drafted so that the words "this section shall not be construed to affect or prevent" raises questions as to the effect of the remaining disciplinary grounds of Sections 71-147 and 71-148 in the event they conflict with a professional's use of "whatever medical care, conventional or nonconventional, which effectively treats". It is unclear whether such a conflict means the disciplinary statutes should be "construed" so as to prohibit discipline for what otherwise would have been a violation of other disciplinary provisions. Section71-148 would still retain statutory language defining "unprofessional conduct" to include the "failure to conform to the standards of acceptable and prevailing practice of a profession". If LB 146 intends to "construe" the latter language out of Section 71-148, then it is unclear if other disciplinary grounds and provisions of Sections 71-147 and 71-148 are also to be construed as non-applicable in situations when "whatever medical care" was "effective".
In general, ambiguity promotes the likelihood of contested cases, more court appeals, and the risk of decisions that denote why law is not an exact science. See, State v. Carter,246 Neb. 953, 976, 524 N.W.2d 763 (1994), quoting from State v. Bible,175 Ariz. at 578, 858 P.2d at 1181, "[B]ecause neither judge nor jury may be able to separate `junk science' from good science, Frye
helps guarantee `that reliability will be assessed by those in the best position to do so: members of the relevant scientific field who can dispassionately study and test the new theory'". The ambiguities of LB 146, as drafted, could allow members of licensed health care professions to dispassionately study and test new theories on the public, with safe havens from discipline being provided to those professionals who make claims of effectiveness which could not be disproved, by clear and convincing evidence, by the State.
 DON STENBERG Attorney General
 James D. Smith Assistant Attorney General
APPROVED BY:
Don Stenberg
Attorney General