Charlotte A. PITCHER,
Plaintiff–Appellee,

v.

**PRINCIPAL MUTUAL LIFE
INSURANCE COMPANY,**
Defendant–Appellant.

No. 95–1971.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 2, 1995.

Decided Aug. 22, 1996.

---

408

Cynthia J. Atsatt (argued), Oppenheimer, Wolff & Donnelly, Minneapolis, MN, Frederick S. Bremer, Indianapolis, IN, for Plaintiff–Appellee.

Cynthia L. Wodock (argued), White & Raub, Indianapolis, IN, for Defendant–Appellant.

Before COFFEY, FLAUM, and EASTERBROOK, Circuit Judges.

COFFEY, Circuit Judge.

Defendant Principal Mutual Insurance Company ("Principal") appeals the district court's order granting summary judgment for plaintiff Charlotte A. Pitcher and denying summary judgment for Principal. The court found that Principal was liable to Pitcher for the cost of certain cancer treatments pursuant to a health insurance policy issued by Principal. Specifically, the court determined that Pitcher's breast cancer was not a "preexisting condition" subject to exclusion under the terms of the insurance policy. *Pitcher v. Principal Mutual Life Ins. Co.*, 870 F.Supp. 903 (S.D.Ind.1994). The district court's

granting of summary judgment in favor of the plaintiff-appellee Pitcher is AFFIRMED.

## I. BACKGROUND

### A. *The Plaintiff's Insurance Policy*

The plaintiff, Charlotte A. Pitcher, commenced full-time employment with the Center for Real Estate Education and Research ("the Center") on August 17, 1992 and became eligible for health benefits under a group health insurance policy underwritten by Principal one month later, on September 17, 1992. The policy contained a provision that excluded coverage for "a pre-existing condition." Article 1 of Section C(2) of the policy defines a pre-existing condition as follows:

> A Pre-existing Condition is a sickness or injury for which a Member or Dependent is confined or received *treatment or service* in the 90–day period before he or she became insured under this policy.

Thus, if Pitcher received "treatment or service" *for* a medical condition existing in the ninety-day period prior to September 17, 1992, that condition would qualify as a "pre-existing condition" under the policy.

### B. *Relevant Aspects of the Plaintiff's Medical History*

For approximately twenty years, the plaintiff Pitcher has suffered from a fibrocystic breast condition. According to the affidavit of Pitcher's primary care physician, Harold Manifold, M.D., this condition is "common" and

> manifests itself by the appearance of benign cysts, masses, and formations of fibrous tissue in the breasts.... [T]he condition is not one which of itself causes any deterioration in health, *nor does it develop into breast cancer.* While fibrocystic breast [condition] does not require any

treatment, it *may* abate if caffeine is eliminated from the patient's diet.

Manifold, M.D. Aff. at 2 (emphasis added).

On July 31, 1992, during Dr. Manifold's routine physical examination of Pitcher, he discovered that she had lumps in both breasts. This was not an unusual or alarming finding, for Pitcher had been a patient of Dr. Manifold's since approximately 1973 and Manifold had, "at various times over the past twenty years," detected "lumps in one or both [of Pitcher's] breasts." Suspecting that in all probability the lumps were nothing more than "fibrocystic breast changes," i.e., a repeat manifestation of his patient's longstanding fibrocystic breast condition, Manifold advised Pitcher to abstain from caffeine, believing that this would cause the lumps to abate. Pitcher followed this advice and returned for a follow-up exam six weeks later, on September 15, 1992, two days before her health insurance policy became effective.

When the September 15 checkup revealed that the lumps had not subsided, Dr. Manifold referred Pitcher to a radiologist for a mammography exam of both breasts that day. The mammogram, according to Dr. Manifold's affidavit, "showed a suspicious mass in the left breast which warranted follow-up investigation" (i.e., a biopsy). The mammography report noted that Pitcher's right breast was "predominantly fibrous," consistent with her longstanding condition, and no further diagnostic or surgical procedures were recommended with respect to the right breast. The biopsy [1] of the left breast was performed September 18, 1992 (the day after the effective date of Pitcher's medical insurance) and revealed a carcinoma, or malignant tumor. The growth was removed by lumpectomy [2] on October 5, 1992, and this surgical procedure was followed by a course of radiation treatments which lasted through December 17, 1992.

With regard to Pitcher's mammogram, Dr. Manifold averred in his affidavit that given the age of the plaintiff (sixty), he "would

---

1. A biopsy is "the removal and examination, usually microscopic, of tissue from the living body, performed to establish precise diagnosis." *Dorland's Illustrated Medical Dictionary* 200 (28th ed. 1994).

2. A lumpectomy is "a surgical excision of only the palpable lesion in carcinoma of the breast; called also tylectomy." *Dorland's Illustrated Medical Dictionary* 962 (28th ed. 1994).

have recommended a mammogram even in the absence of fibrocystic breast changes since it had been more than a year since Ms. Pitcher had had a mammogram."

### C. *The Plaintiff's Claim for Benefits*

Pitcher sought reimbursement for the costs she incurred for all of the cancer-related procedures *subsequent* to the effective date of the policy, i.e., the biopsy and the lumpectomy, as well as the radiation treatments (total amount, $24,260). Principal, after reviewing Pitcher's medical records, determined that Pitcher had received "treatment or service" for breast cancer within the ninety-day period prior to the effective date of the policy and therefore denied coverage by a letter dated February 9, 1993. Pitcher asked her insurer to review the denial of coverage, and on March 5, 1993 she was informed by letter that Principal had conducted a review and considered its "original determination ... correct."

### D. *District Court Proceedings*

Pitcher initially brought suit against Principal in Indiana state court in June 1993, seeking recovery for breach of contract, breach of the duty of good faith and fair dealing, and negligence. Subsequently, Principal filed a Notice of Removal with the United States District Court, arguing that the federal court had jurisdiction over Pitcher's claim because it arose under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001–1461,[3] or, alternatively, because the parties were of diverse citizenship, 28 U.S.C. § 1332. *See* 28 U.S.C. § 1441(a). The district court issued its own Notice of Removal on July 7, 1993, permitting the case to go forward in federal court.

On May 12, 1994, following discovery, Pitcher filed a motion for summary judgment,[4] arguing that Principal was liable for the cancer-related procedures as a matter of law because the cancerous tumor in her left breast was discovered after the commencement of the coverage period and therefore was not a pre-existing condition as defined by the contract. Pitcher also requested attorney's fees under 29 U.S.C. § 1132(g)(1).

On June 29, 1994, Principal filed a response opposing Pitcher's motion for summary judgment, as well as its own motion for summary judgment. The insurance company conceded that both Pitcher and her physician, at the time of her examination in late July, 1994, were of the belief that the lumps were the result of her previously-diagnosed, longstanding fibrocystic breast condition and not cancer. The defendant-appellant further conceded that when Pitcher was examined and given a mammogram on September 15, 1992 (two days before the policy effective date) neither she nor her physician knew that she was suffering from cancer. However, Principal argued that it was "clear that Ms. Pitcher received treatment or service during the pre-existing condition period *for the symptoms of a sickness which ultimately proved to be breast cancer.*"[5] Therefore, the procedures she underwent after coverage commenced (i.e., the biopsy, lumpectomy,

---

**3.** 29 U.S.C. § 1132 provides that "[a] civil action may be brought by a participant or beneficiary ... to recover benefits due to him under the terms of his plan...." 29 U.S.C. § 1002 defines "plan" to include "medical, surgical, or hospital care or benefits, or benefits in the event of sickness...."

**4.** In her motion, Pitcher requested that her action be amended such that her contract claim be treated as a claim for benefits pursuant to 29 U.S.C. § 1132(a)(1)(B) and her other state law claims stricken. Principal did not object to this amendment.

**5.** We are persuaded that Principal's assertions concerning the plaintiff's symptoms during the pre-coverage period are without support in the record and are, at best, speculative. The record is devoid of any evidence establishing that the lumps detected in Pitcher's breasts by Dr. Manifold, while examining with fingertip palpation, were in fact manifestations of the cancerous tumor that was eventually diagnosed (in the *left* breast only) through biopsy. On the other hand, the record does clearly establish that Pitcher had suffered from a fibrocystic breast condition for some twenty years. The cysts, masses, and fibrous tissues that result from a fibrocystic breast condition (and/or excessive body fat) can mask the presence of a breast tumor. Indeed, the pathologist's report on the mass removed from the plaintiff's left breast (by lumpectomy) noted the presence of "copious fibrous tissue."

and radiation treatments) were not covered under the policy.

On December 15, 1994, the trial court granted the plaintiff-appellee Pitcher's motion for summary judgment and denied the defendant insurance company's motion, finding that the insurance company was liable to Pitcher as a matter of law. The court based its decision on two grounds. First, the court found that Pitcher had not received "treatment or service" *for* breast cancer prior to September 17, 1992, the effective date of the policy. The trial judge also found that the language in the policy defining "pre-existing condition" was ambiguous and therefore construed the policy against the drafter (Principal), under the rule of *contra proferentem*. See *Phillips v. Lincoln Nat'l Life Ins. Co.*, 978 F.2d 302, 310 (7th Cir.1992).[6] The parties later stipulated to damages and attorney fees totalling $38,474 plus interest. This appeal challenges the district court's determination of liability.

## II. ISSUES

This appeal presents two questions of contract law: (1) whether Pitcher received "treatment or service" for breast cancer prior to the effective date of her insurance policy, such that her claim for benefits is barred by the policy's pre-existing condition clause, and (2) whether the terms of the insurance policy are ambiguous and therefore must be construed in favor of the insured under the rule of *contra proferentem*. We review the district court's findings on these questions of law *de novo*. *Metropolitan School Dist. of Wayne Township v. Davila*, 969 F.2d 485, 488 (7th Cir.1992), *cert. denied*, 507 U.S. 949, 113 S.Ct. 1360, 122 L.Ed.2d 740 (1993).

## III. DISCUSSION

### A. *Governing Legal Principles*

■ We note that an insurance policy is a written contract that memorializes an agreement or "meeting of the minds" between the insurer (Principal) and the insured (Pitcher). *Bullwinkel v. New England Mu-*

*tual Life Ins. Co.*, 18 F.3d 429, 431 (7th Cir.1994). In exchange for the payment of premiums by Pitcher, Principal agreed to cover certain medical expenses of Pitcher's, subject to the terms and conditions of the contract (including the pre-existing condition clause). Because the policy issued by Principal was part of an employee benefit plan, this action is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). Thus, we apply federal common law rules of contract interpretation to determine the meaning of the policy's terms. *Id.* This body of law instructs us to interpret the insurance contract between Principal and Pitcher "[i]n an ordinary and popular sense as would a person of average intelligence and experience...." *Meredith v. Allsteel Inc.*, 11 F.3d 1354, 1358 (7th Cir.1993). In addition, "ambiguous terms in an insurance contract will be construed in favor of the insured." *Hammond v. Fidelity and Guaranty Life Ins. Co.*, 965 F.2d 428, 430 (7th Cir.1992).

■ Finally, as this court has explained previously, "we are restricted by federal common law rules of contract interpretation to view the language of the insurance policy to determine where the parties' minds met" and "must give effect to the words which denote the bargain, not in light of public policy considerations, but in light of their plain meaning." *Bullwinkel*, 18 F.3d at 431 (citation omitted).

### B. *Pitcher Did Not Receive "Treatment or Service" for Breast Cancer Within 90 Days Before the Effective Date of Her Policy*

■ The key question in this appeal is whether, in the words of the policy, *Pitcher received a "treatment or service" for breast cancer* during the ninety-day period prior to the effective date of coverage (September 17, 1992), *and not whether Pitcher actually had breast cancer during this time period*. The only events that could arguably constitute such a "treatment or service" are (1) the routine physical examination on July 31, during which Dr. Manifold detected lumps in

---

**6.** The district court invoked this alternative theory *sua sponte*; the doctrine of *contra proferentem*   was not raised in Pitcher's memorandum in support of summary judgment.

both breasts that he believed to be the result of Pitcher's longstanding fibrocystic breast condition, (2) the follow-up exam with Dr. Manifold on September 15, or (3) the mammogram (administered on September 15).[7]

Interpreting the language of Principal's insurance policy "[i]n an ordinary and popular sense as would a person of average intelligence and experience," *Meredith*, 11 F.3d at 1358, we hold that Pitcher did *not* receive a "treatment or service" *for* breast cancer prior to September 17, 1992 because—as the district court found—she was being monitored for the longstanding fibrocystic breast condition and not cancer during the pre-coverage period. A fibrocystic breast condition is unrelated to cancer, even though it manifests itself in the *same* area of the body as breast cancer and takes on the form of cysts, masses, and formations of fibrous tissue.

The record establishes that Pitcher's primary care physician, Dr. Manifold, did not render a *"treatment or service" for breast cancer* when he conducted a routine physical examination in late July 1992. During this routine physical exam, Dr. Manifold discovered breast lumps that were entirely consistent with Pitcher's fibrocystic breast condition. The "treatments" or "services" rendered by Dr. Manifold on this occasion (the performance of the routine physical, the fingertip palpation exam of Pitcher's breasts, and the recommendation that Pitcher eliminate caffeine from her diet) had nothing to do with breast cancer and were directed at the fibrocystic breast condition. The follow-up exam on September 15, likewise, fails to meet the test of a "treatment or service" *for* breast cancer. The sole purpose of this examination was to determine whether abstaining from caffeine, as directed, had alleviated the symptoms of the fibrocystic breast condition. Neither the plaintiff nor her physician, at this juncture, had reason to suspect that Pitcher's symptoms were anything but a continuation of her longstanding fibrocystic breast condition. In light of Pitcher's long history of "fibrocystic breast changes," we

find puzzling Principal's bold assertion that "[t]here is no evidence in the record to suggest that Mrs. Pitcher's left breast mass was anything other than cancer." Principal attempts to characterize the lumps felt by Dr. Manifold in July and late September as symptoms of the as-yet undiagnosed breast tumor, but the record does not support this speculative characterization. *See supra* note 5.

In order to downplay the significance of Pitcher's fibrocystic breast condition, Principal also argues that because the condition is "non-health threatening and requires no treatment," Dr. Manifold's careful observation and monitoring of Pitcher's "fibrocystic breast changes" may *not* be considered a treatment or service directed at the fibrocystic breast condition and *must* be considered a treatment or service for breast cancer. We reject this argument because it is clear that Dr. Manifold's monitoring of Pitcher's symptoms, and his recommendation that Pitcher eliminate caffeine from her diet, were medical "services" directed at the fibrocystic breast condition. Granted, obviously a fibrocystic breast condition is not as serious or as "health-threatening" as cancer, but it certainly does not follow from this "given," as the appellant argues, that a physician is unable to render services in connection with the ailment, as Dr. Manifold clearly did in Pitcher's case.

Was the mammogram (administered September 15) a "treatment or service" for breast cancer? We note, first, that *a mammogram is not "treatment" for breast cancer (or anything else), for it is a purely diagnostic procedure.* Treatment, as this court has recognized, "occurs when a health care provider takes steps to *remedy or improve* a malady." *Shanks v. Blue Cross and Blue Shield*, 979 F.2d 1232, 1233 (7th Cir.1992). The medical community properly recognizes active measures such as surgery (i.e., mastectomy and lumpectomy), radiation therapy, chemotherapy, and hormone therapy as "treatments" for breast cancer, and regards

---

7. The remaining procedures relevant to this case (the biopsy, the lumpectomy, and the radiation treatments) all occurred *after* the effective date of the policy. The parties do not dispute that if the pre-existing condition exclusion is *in*applicable, these procedures are covered by the policy regardless of whether they are considered treatments or diagnostic measures.

mammograms and/or biopsies as diagnostic procedures only. American Cancer Society, *Breast Cancer Facts & Figures* 6–7 (1996); *see also supra* note 1 (definition of biopsy).[8] Treatment for Pitcher's breast cancer did not commence until after the biopsy procedure (including pathological examination of the removed tissue) had conclusively identified a cancerous growth in her left breast; until that time, all concerned assumed that they were dealing with the longstanding fibrocystic breast condition, manifesting itself in the form of cysts, masses, and formations of fibrous tissue in both breasts. See *Ross v. Western Fidelity Ins. Co.*, 881 F.2d 142, 144 (5th Cir.1989) ("treatment *for a specific condition* cannot be received unless the specific condition is known.").

If, as we hold, the mammogram was not a *"treatment"* for Pitcher's breast cancer, could the mammogram be considered a *"service"* for the breast cancer within the meaning of the policy's language? While a mammogram can be classified as a medical "service," it was *not* a service *for* Pitcher's breast cancer but a service rendered solely for and in connection with the ongoing monitoring of her fibrocystic breast condition. In this regard, we hasten to point out that while the diagnostic procedure known as mammography is widely regarded as one of the most effective procedures for the detection of breast cancer, it is not used *exclusively* for that purpose. Mammography is also used to confirm a diagnosis of fibrocystic breast condition as well as to monitor that condition, 4C *Attorneys' Textbook of Medicine* § 312.32(1) (1996), and also to detect early adult-onset diabetes in females, which manifests itself by calcification of the breast arteries. Cathy Pinckney and Edward R. Pinckney, M.D., *The Patient's Guide to Medical Tests* 284 (Facts on File 1986).

With regard to Pitcher's mammogram, the trial judge found it significant that Dr. Manifold would have ordered the procedure as a routine matter (quite apart from the lumps detected) because of Pitcher's age (60) and the fact that she had not undergone a mammogram in one year or more.[9] We agree with the district court's finding that the mammogram in the factual situation presented here was neither a treatment nor a service "for" breast cancer but is more accurately described as either (1) part of Dr. Manifold's efforts to evaluate and monitor her fibrocystic breast condition, or (2) a routine diagnostic procedure. The fact that a physician orders a routine mammography exam does not mean that he necessarily suspects cancer in a particular patient, but only that he is practicing sound medicine. As a colleague on the Fourth Circuit has observed:

> *Every* woman must be concerned about and take precautions against breast cancer. Physicians ... order mammograms and other diagnostic tests routinely, not because the risk to any single woman is very great, but because the risk is there in every woman, and the consequence of not taking routine precautions is so dire. A doctor who ignores a one percent risk of death present in all of her patients can be assured that several will die every year.

*Hardester v. Lincoln Nat'l Life Ins. Co.*, 33 F.3d 330, 339 (4th Cir.1994) (Hall, J., dissenting) (opinion discussed *infra*).

The facts in this case are unusual, but not unheard of, inasmuch as the plaintiff had been diagnosed with a fibrocystic breast condition and suffered from the symptoms of that condition (breast lumps) for a number of years (20), including the period immediately

**8.** Principal attempts to argue that the term "treatment" is very broad and encompasses anything and everything, including diagnostic procedures. In support of this proposition, Principal cites *Zeh v. Nat'l Hosp. Ass'n,* 233 Or. 221, 377 P.2d 852 (1963). However, *Zeh* is not on point because that case did not focus on the meaning of the term "treatment." Rather, *Zeh* concerned the issue of whether various chiropractic services fell within the definition of "medical care" for purposes of a pre-existing condition clause in a health insurance policy.

**9.** The American Cancer Society recommends that women fifty years of age or older undergo an annual mammography examination. American Cancer Society, *Breast Cancer Facts & Figures* 8 (1996). Medicare reimburses for mammograms on a biennial basis for women in this age category. Karen K. Lindfors & John Rosenquist, *The Cost–Effectiveness of Mammographic Screening Strategies,* 274 JAMA 881 (September 20, 1995).

prior to her cancer diagnosis. From our research we have been able to discover just one other case with facts similar to those before us: the *Hardester* case from the Fourth Circuit. The plaintiff in *Hardester*, like Pitcher, suffered from a fibrocystic breast condition that manifested itself in both breasts. Hardester was initially diagnosed with this condition in 1981 and the symptoms of her condition (i.e., breast lumps) were monitored during the exclusionary period immediately prior to the effective date of her health policy in 1992. However, Hardester, like Pitcher, was not definitively diagnosed with breast cancer until *after* the effective date of her policy, when a biopsy indicated that cancer was present in her left breast. When Hardester sought reimbursement for cancer treatments administered subsequent to the effective date of her policy, she was denied coverage on the basis of a pre-existing condition clause and she then brought suit in federal court under ERISA. On motions for summary judgment submitted by both parties, the district court ruled in Hardester's favor, finding that prior to the effective date of the policy, she had received "medical attention" *only* for the fibrocystic breast condition, and not the breast cancer. *Hardester v. Lincoln Nat'l Life Ins. Co.*, 841 F.Supp. 714, 716 (D.Md.1994) [*Hardester I*]. The district court stressed that "the simultaneous occurrence of the two conditions was coincidental" and underscored the unfairness of defining a condition as "pre-existing" when the person suffering from the condition (i.e., the plaintiff) "does not know, or have reason to know of the existence of the condition." *Id.* On appeal, a divided panel of the Fourth Circuit reversed the district court, with Circuit Judge K.K. Hall dissenting. 33 F.3d 330, 337–40 (4th Cir.1994) [*Hardester II*]. However, after hearing the case *en banc*, the Fourth Circuit affirmed the ruling of the district court and explicitly adopted the reasoning of the dissenting judge on the original appellate panel, Judge Hall. 52 F.3d 70 (4th Cir.1995) [*Hardester III*]. In light of the factual similarities between *Hardester* and the instant case, we analyze Judge Hall's dissenting opinion, which is now the law of the Fourth Circuit. Judge Hall emphasized that "there was no causal or associative relationship between the fibrocystic tissue and the carcinoma," *Hardester II*, 33 F.3d at 339, and that the two conditions were "merely, and luckily, *coincident.*" *Id.* at 338 (emphasis in original). In Hardester's case, and in Pitcher's as well, the breast cancer was not a "pre-existing condition," for it "was discovered in the course of treating an *unrelated* manifest condition" (the fibrocystic breast condition) and moreover, was not discovered (i.e., definitively diagnosed) until *after* the effective date of the policy. *Id.*

Principal, in an effort to demolish the plaintiff's strongest precedent, suggests that *Hardester* is distinguishable from the case before us because the tumor in Hardester's breast, unlike Pitcher's carcinoma, was "completely encompassed within the fibrocystic mass and would not alone have been observable." Principal's argument, as we understand it, is that the tumor in Hardester's case would have been difficult if not impossible to detect—with or without the fibrocystic breast condition—during the pre-coverage period. Therefore, the cancer could not in all fairness be considered a pre-existing condition. Without support in the record, Principal maintains that the same is not true of Pitcher's case. We find Principal's argument speculative, at best, and therefore not a proper basis for distinguishing *Hardester* from the case before us. As an initial matter, we note that the record in *Hardester* was more factually-developed than is Pitcher's case. Here, there is no medical testimony that Pitcher's tumor was (or was not) "completely contained within the fibrocystic mass." Similarly, there is no evidence concerning the size of the tumor (i.e., whether it was large enough to be detected in the absence of the symptoms of the fibrocystic breast condition). However, the record does establish that Pitcher suffered for approximately twenty years from the cysts, masses, and fibrous tissues that are characteristic of a fibrocystic breast condition.[10] Moreover, the patholo-

---

10. As noted above, Principal completely disregards this most significant aspect of Pitcher's medical history when it states that "there is no evidence in the record to suggest that Mrs. Pitcher's left breast mass was anything other than cancer."

gist's report (following the lumpectomy) noted the presence of "copious fibrous tissue" in Pitcher's left breast. We do not agree with Principal's assertion that the presence of "co-existing" fibrocystic masses is "irrelevant." The fact that such masses were present suggests that in Pitcher's case, as in Hardester's, the symptoms of the fibrocystic breast condition were in all probability masking the presence of the tumor. As even Principal concedes, "the one disease [fibrocystic breast condition] cannot be distinguished from the other [cancer] by manual examination alone." Therefore, it is certainly "relevant" that the fibrocystic lumps were present, for the presence of such lumps made the detection of a cancerous growth more difficult and led Dr. Manifold to a reasonable medical belief or assumption that he was dealing—not with cancer—but with a continuation of the fibrocystic breast condition. Once again, it is the *similarities* between this case and *Hardester* that we find significant, and not the differences hypothesized by Principal.

With regard to Seventh Circuit precedent, Principal argues that this court's decision in *Bullwinkel* precludes a finding in Pitcher's favor. However, we hold that the case before us, which involves a combination of medical problems, is easily distinguishable from *Bullwinkel*, in which the plaintiff suffered from cancer *and only cancer*. Bullwinkel, unlike Pitcher, had no history of a fibrocystic breast condition. She visited her physician in July of 1991 (less than two weeks before the effective date of her health insurance coverage), not for a routine physical exam but rather because she had detected a single lump in her left breast. Upon performing an ultrasound examination of the left breast, her physician also became "concerned about the possibility of cancer" (although he did not think it likely) and ordered removal and biopsy of the lump, which occurred in September 1991 (after the effective date of the policy), revealing the presence of cancer:

> In July 1991, Madelaine [Bullwinkel] noticed a lump in her left breast. She had detected a similar lump the previous February, but a mammogram did not reveal any abnormality. On July 20, 1991, [Bullwinkel] visited her physician, who performed an ultrasound examination. This time, he detected what he diagnosed as a cyst. He made no definite conclusion whether the cyst was cancerous or benign. He assured [Bullwinkel], however, that more than likely the cyst was benign. But he was concerned about the possibility of cancer. He referred [Bullwinkel] to a surgeon for removal and biopsy of the cyst, telling her "Let's be safe and take it out."

*Bullwinkel*, 18 F.3d at 430.

The belief of Bullwinkel's doctor, in July 1991, that the growth was more likely benign than malignant did not persuade this court that the plaintiff sought out and received medical attention for a condition *other than breast cancer* prior to the effective date of the policy. Bullwinkel's visit to her physician in July 1991 was not of a routine nature; rather, it was prompted by a specific concern that the lump in her breast (initially detected in February 1991) might be cancerous, and this concern was shared by her doctor, despite his belief that the growth was likely benign. We concluded that "[t]he only reasonable inference" permitted by the record was that "the lump discovered to be cancerous in September [1991] was also cancerous in July [1991]." *Id.* at 433. Thus, "[e]ven though [Bullwinkel] did not know the lump was cancerous in July, *her visit* with the doctor in that month concerning the lump *actually concerned cancer*." *Id.* In other words, to use the language of Bullwinkel's insurance policy, Bullwinkel was "seen, treated, diagnosed, or incurred medical expenses" for cancer when she sought medical attention for the lump in her left breast in July 1991. *Id.* at 432.

While Bullwinkel's July 1991 visit to her physician "concerned cancer" and cancer only, the same cannot be said with respect to either of Pitcher's visits to Dr. Manifold (in July and September of 1992). Pitcher had the misfortune of suffering from a longstanding fibrocystic breast condition that resulted in "cysts, masses, and formations of fibrous tissue" in both of her breasts. Her physician was in the process of monitoring this fibrocystic breast condition during the time frame immediately prior to the effective date of her health insurance coverage and, as explained

above, had no reason to suspect, much less believe, that his patient was afflicted with anything but a fibrocystic breast condition. In other words, Pitcher's cancer, like Hardester's, "was discovered in the course of treating an unrelated manifest condition [fibrocystic breast condition], while in *Bullwinkel* the only issue was whether the manifest condition was or was not malignant. In other words, the cancerous lump was discovered before the effective date in *Bullwinkel;* here, the cancerous lump was discovered *after* the effective date." *Hardester II,* 33 F.3d at 339.

Pitcher's case and Bullwinkel's are also distinguishable on legal grounds because the respective insurance policies in the two cases employed different contractual language to define the term "pre-existing condition." As we noted at the outset of our discussion, an insurance policy is a contract, the specific terms and conditions of which are agreed to by both the insurer and the insured. However, not all insurance policies—and not all "pre-existing condition" clauses—are drafted in precisely the same fashion. The *Bullwinkel* policy defined a "pre-existing condition" as "a condition, sickness, or injury for which you or your dependent were seen, treated, *diagnosed,* or incurred medical expense in the six-month period just before insurance starts." *Id.* at 431. The ultrasound examination of Bullwinkel's breast triggered the policy's pre-existing condition clause because the detailed and all-inclusive language of her policy *explicitly referred to diagnostic procedures.* The brief definition of "pre-existing condition" in the Principal policy, by contrast, is less specific; it makes no mention of diagnostic procedures and states only that a "pre-existing condition" is a "sickness or injury *for which* [an insured] received *treatment or service* in the 90–day period before he or she became insured under this policy." As discussed above, we are convinced that the medical attention Pitcher received for her fibrocystic breast condition in the ninety-day period before September 17, 1992 cannot be considered "treatment or service" *for* breast cancer.

In light of the factual and legal differences between *Bullwinkel* and the case before us,

we disagree with Principal's overbroad and self-serving assertion that the "question here is identical to the question answered by this court in *Bullwinkel.*" Indeed, the court in *Bullwinkel* was careful to point out that its holding was based on the particular facts of Bullwinkel's case and was "obviously" not intended "as an authorization for summary judgment [in favor of insurers] in all future cases dealing with pre-existing condition limitations." *Id.* at 433.

In addition to *Bullwinkel,* Principal relies upon this court's decision in *Shanks,* 979 F.2d 1232, a case in which the plaintiff sought reimbursement, pursuant to the terms of a health insurance contract, for the costs associated with a spinal fusion procedure. *Shanks* (like *Bullwinkel*) is both legally and factually distinguishable from the case before us. In *Shanks,* this court affirmed a summary judgment ruling in favor of an insurance company that had denied coverage on the basis of a pre-existing condition clause. However, the language in the *Shanks* policy differed from the language used in Principal's policy. Instead of using the terms "treatment or service," as in Principal's policy, the *Shanks* policy defined a pre-existing condition as one for which the insured received "medical care or treatment" during the twelve-month period prior to the effective date of the policy. The *Shanks* policy, in turn, defined "medical care" as "*professional services* rendered by a PHYSICIAN or a PROFESSIONAL OTHER PROVIDER *for the treatment of* an ILLNESS or injury by other than surgical methods." (emphasis added). *Shanks* was claiming insurance benefits for a spinal fusion procedure that he had undergone after the effective date of his health insurance policy. Unfortunately for *Shanks,* the record clearly reflected that he had seen a back specialist for this *same* back problem less than one year before the effective date of the policy. The spinal specialist had reviewed the plaintiff's case history, examined the plaintiff's back, performed x-rays, and diagnosed the plaintiff as having early degenerative disc disease. The specialist had also given *Shanks* extensive advice on how to prevent and alleviate the discomfort and back pain associated with this condition. This court held that the visit

to the specialist constituted "medical care or treatment" for the back problem, such that it was a "pre-existing condition" within the meaning of the policy, and we rejected the plaintiff's argument that the specialist had "simply diagnosed him without any intrusiveness." 979 F.2d at 1233. In short, *Shanks* involved a plaintiff who became aware of (and sought and received "medical care or treatment" for) a *single*, clearly-identified medical condition during the pre-coverage period. Pitcher, by contrast, suffered from a combination of medical conditions but had no reason to suspect and was unaware of the existence of her breast cancer until after the effective date of the policy. In light of these differences, we are not persuaded that *Shanks* supports Principal's position.

Principal cites additional cases that are also distinguishable from the case before us. In *Fischman v. Blue Cross and Blue Shield*, 775 F.Supp. 513 (D.Conn.1991), for example, the plaintiff suffered from rectal cancer and the only issue in the case was whether he received "medical advice or treatment" for that condition during the pre-coverage period. The court concluded that it was symptoms of the rectal cancer that prompted Fischman to seek "medical advice" (from a gastroenterologist) prior to the effective date of coverage, even though a definitive diagnosis of rectal cancer was not made until after a colonoscopy performed following the effective date of coverage. As in *Bullwinkel* and *Shanks*, there was only one medical condition in *Fischman*, and not the combination of conditions we have in the Pitcher case. Another case cited by Principal, *Cury v. Colonial Life Ins. Co. of America*, 737 F.Supp. 847 (E.D.Pa.1990), involved a plaintiff afflicted with multiple sclerosis or "MS." In *Cury*, the court determined that the plaintiff, during the pre-coverage period, had seen a neurologist for "consultation" regarding a condition *which had previously been diagnosed as* "likely" or "most likely" MS. Although the condition was not *definitively* diagnosed until *after* the effective date of coverage, the court held that the plaintiff's visit to the neurologist during the pre-coverage period constitut-

ed (in the words of the policy) a "consultation" for the MS. "[T]he mere fact that [the physician] retained some doubts about the correct diagnosis" did not alter this conclusion. *Id.* at 855. Obviously, visiting a specialist about a condition which one *knows* is "likely" or "most likely" MS amounts to "consultation" for the MS. Pitcher, by contrast, did not seek out a cancer specialist, nor (at the time she saw Dr. Manifold for a routine physical) did she have any idea, based upon her medical history, that she might have breast cancer. *Cury* is therefore inapposite. However, a very different case was presented in *Hughes v. Boston Mut. Life Ins. Co.*, 26 F.3d 264 (1st Cir.1994), which also involved an MS patient. Unlike the situation in *Cury*, "neither Hughes nor the physicians who treated his symptoms [in the pre-coverage period] were aware that he was being treated for 'most likely MS,' 'probable MS,' or even 'possible MS.'" In other words, Hughes and his doctors were unaware, during the pre-coverage period, that he was suffering from MS (just as Pitcher and her physician were unaware that they were dealing with cancer). On these facts, the First Circuit refused to hold, as urged by the insurance company in the case, that Hughes had "received treatment 'for' MS during the critical [period] before the effective date of the policy." *Id.* at 270.

We hold that the district court's grant of summary judgment in favor of Pitcher was proper. As we interpret the contractual language at issue here, she did not receive "treatment or service" *for* breast cancer within 90 days before the effective date of the policy. Thus, her breast cancer was not a "pre-existing condition" within the meaning of the health insurance policy, and she may recover the cost of the cancer-related procedures, administered *after* the policy went into effect, for which she originally sought reimbursement (i.e., the biopsy, the lumpectomy, and the radiation treatments).[11]

### C. The Terms of the Insurance Policy Are Not Ambiguous

In addition to finding that Pitcher was entitled to reimbursement under the terms of

---

11. Pitcher does not seek to recover the expense of the mammogram, which, as we have stated, was related to her fibrocystic breast condition

and not her breast cancer. Moreover, the mammogram was administered on September 15, 1992, prior to the effective date of the policy.

the insurance contract, the district court declared, in the alternative, that the language of the policy was ambiguous and ought to be construed in Pitcher's favor under the doctrine of *contra proferentem*. We are not persuaded that the terms of the policy are ambiguous, and therefore do not believe it is necessary to discuss the law concerning ambiguities in contracts. However, we emphasize that whether the rule of *contra proferentem* applies or not, the plaintiff is entitled to summary judgment.

It is an axiom of insurance law that "ambiguous terms in an insurance contract will be strictly construed in favor of the insured." *Phillips v. Lincoln Nat'l Life Ins. Co.*, 978 F.2d 302, 308 (7th Cir.1992) (citation omitted). However, as this court has often stated, "we will not artificially create ambiguity where none exists." *Id.* (quotation omitted). "[T]he rule that ambiguities must be resolved against insurers can only be invoked when there exists a *genuine (meaning, substantial) uncertainty, not resolvable by other means.*" *Id.* at 313 (emphasis added) (quotation omitted). As we have explained, "[r]ules of interpretation are tie-breakers, even when the words being interpreted appear in insurance policies." *Id.* (quotation omitted).

The language in the pre-existing condition clause of Principal's policy does not create "genuine" or "substantial" uncertainty, *id.*, such that the rule of *contra proferentem* should come into play. Because there is no ambiguity in the language of the insurance policy (as applied to this case) and because the parties' dispute over coverage may be resolved in Pitcher's favor *without* resort to the rule of *contra proferentem* (as discussed above), we see no need to rely upon this rule of interpretation as a basis for affirming the district court.

## IV. CONCLUSION

As the district court properly found, Pitcher did not receive "treatment or service" for breast cancer prior to the effective date of the policy and Principal is therefore liable to Pitcher for the medical costs she incurred after the policy went into effect. With the exception of its discussion of the doctrine of *contra proferentem*, the order of the district court is

AFFIRMED.