**Valerie K. HALL, Plaintiff,**

v.

**CONTINENTAL CASUALTY COMPANY, Defendant.**

**No. 01–C–175–C.**

United States District Court, W.D. Wisconsin.

· Feb. 1, 2002.

---

Ryan M. Benson, for plaintiff.

Maile E. Buell, Borgelt, Powell, Peterson & Frauen, Milwaukee, WI, for defendant.

## OPINION AND ORDER

CRABB, District Judge.

In this civil action for monetary relief, plaintiff Valerie K. Hall contends that defendant Continental Casualty Company breached its long-term disability insurance policy by denying her claim for long-term disability benefits on the ground that plaintiff's lung cancer is a pre-existing condition excluded from coverage. Plaintiff also alleges that defendant denied her claim for benefits in bad faith and seeks interest on the overdue claim payment.

Plaintiff filed this action in the Circuit Court for Portage County, Wisconsin. Defendant removed it to this court under 28 U.S.C. § 1441(a). Although plaintiff's claim for insurance benefits under an employer-sponsored benefits plan is like a claim under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001–1461, her policy was issued under a government plan and for that reason is exempt from ERISA. 29 U.S.C. § 1003(b) (excluding government plans from act's coverage). Federal question jurisdiction is not present but plaintiff and defendant are citizens of different states and there is more than $75,000 in controversy, making diversity jurisdiction applicable. Because plaintiff is suing in contract, defendant is not considered a citizen of Wisconsin under 28 U.S.C. § 1332(c)(1), as it would be if plaintiff were bringing a direct action against defendant suing in tort.

Presently before the court is defendant's motion for summary judgment. Because the undisputed facts establish that plaintiff did not receive treatment or advice for lung cancer before the effective date of her policy, I conclude that the pre-existing condition clause does not apply and that, as a result, defendant breached its contractual duty by denying plaintiff's claim for long-term disability benefits on that basis. Defendant's motion for summary judgment as to the breach of contract claim will be denied. Because the material facts surrounding plaintiff's medical care are not disputed, I will enter summary judgment for plaintiff on this claim, as is permitted where the record reveals that the non-moving party is entitled to judgment. *Borcherding–Dittloff v. Corporate Receivables, Inc.*, 59 F.Supp.2d 822, 826 (W.D.Wis.1999); *see also* 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure 3d* § 2720 at 347 (1998) (summary judgment may be entered in favor of non-moving party even though no formal cross-motion has been filed).

Because I find that plaintiff's claim for coverage was "fairly debatable," defendant's motion for summary judgment as to plaintiff's claim for bad faith denial of coverage will be granted. Finally, because I find that the undisputed facts do not establish whether defendant had reasonable proof to establish that it was not responsible for payment of plaintiff's claim, defendant's motion for summary judgment on plaintiff's claim for interest under Wis. Stat. § 628.46 will be denied.

From the proposed findings of facts submitted by the parties, I find the following facts to be material and undisputed.

## UNDISPUTED FACTS

### A. *Parties*

Plaintiff Valerie K. Hall is a resident of Portage County, Wisconsin. At all times relevant to this action, she worked for Portage County, through which she obtained group long-term disability benefits. Defendant Continental Casualty Company is a foreign corporation with its principal place of business in Illinois. It is engaged in the business of issuing group long-term disability insurance policies.

### B. *The Policy*

Defendant issued Portage County a policy that provides for the payment of benefits in the event of the total disability of an employee. The summary plan description is a document given to employees to explain their benefits under the policy. Under the policy, a "total disability" means that the insured employee, "because of Injury or Sickness, is: (1) continuously unable to perform the substantial and material duties of his regular occupation; (2) under the regular care of a licensed physician other than himself; and (3) not gainfully employed in any occupation for which

he is or becomes qualified by education, training or experience." These conditions must be in place for the first 90 days of the alleged disability and for the following 24 months. The summary plan description defines sickness as "sickness or disease causing loss which begins while Your coverage is in force. It does not include any loss resulting from a Pre-existing Condition." The summary plan description defines a pre-existing condition as "a condition for which medical treatment or advice was rendered, prescribed or recommended within 3 months prior to Your effective date of insurance. A condition shall no longer be considered Pre-existing if it causes loss which begins after You have been insured under the policy for a period of 12 consecutive months." The definition of pre-existing condition found in the policy itself is virtually identical.

To be eligible for benefits under the policy, an employee must work on a full-time basis, which means at least 30 hours a week. A new full-time employee becomes eligible for coverage 30 days after the first date of full-time employment. Plaintiff became a full-time employee on August 1, 1999 and became eligible for long-term disability benefits on September 1, 1999.

### C. *Plaintiff's Medical History*

On July 28, 1999, plaintiff went to the emergency room of St. Michael's Hospital in Stevens Point, Wisconsin, complaining that she was experiencing chest pain and shortness of breath and that her left arm was going to sleep. Plaintiff had a history of asthma-related problems and had suffered chest pain and shortness of breath as a result of this condition a number of times in the past. Shortness of breath and chest pain are also symptoms of later stage lung cancer. Dr. Randal Wojciehoski was plaintiff's treating physician in the emergency department. He diagnosed plaintiff as having pneumonia, tachycardia and asthma and told plaintiff that she had

pneumonia. Dr. Wojciehoski ordered a number of diagnostic procedures, one of which was a chest x-ray. Plaintiff underwent a chest x-ray because of her tachycardia, dyspnea and anxiety. Dr. Wojciehoski recommended to plaintiff that she schedule an appointment with her primary physician, Dr. William Benn, in one to two weeks.

The same day, Dr. David Enerson, a radiologist, interpreted plaintiff's chest x-ray and found a rounded area of increased density in the right upper lobe of plaintiff's lung with irregular margins. To Dr. Enerson, the spot represented an abnormal process that could have resulted from several conditions, such as cancer, scar tissue or pneumonia. According to Dr. Enerson, it is unusual but not rare to find pneumonia indicated by a round mass with irregular margins. Dr. Enerson concluded that the increased density was probably the result of an air space disease from pneumonia but that, because of plaintiff's history of smoking, the spot could also be a neoplastic process (a tumor that can be either benign or malignant). Dr. Enerson recommended a follow-up x-ray in two weeks to see whether the process persisted or disappeared. If the process were to disappear, a neoplasm would not be a consideration. If it were to persist, a neoplasm would become a stronger consideration. In that case, more testing would be required to rule out lung cancer because it is not possible to determine from an x-ray whether a person has cancer. Even if Dr. Enerson had not suspected a neoplasm, he would have recommended follow-up x-rays because plaintiff is a smoker, raising the suspicion that the spot was a tumor or the result of a tumor. After interpreting the x-ray and finding the abnormality, Dr. Enerson "red flagged" his report and sent it to the emergency department.

Later in the day on July 28, Dr. Sean Alwin, an emergency department physician, received Dr. Enerson's report and noted the possibility of a pulmonary nodule. He called plaintiff and told her that the x-ray showed a dark spot on one of her lungs that was most likely a result of her pneumonia. He did not mention to plaintiff that the spot might be cancer. In his experience, use of the word cancer could be premature and cause patients undue stress. Dr. Alwin suspected that the spot could be a cancerous tumor, among other possibilities. Dr. Alwin told plaintiff to obtain a follow-up x-ray in two weeks with Dr. William Benn, plaintiff's regular physician. According to Dr. Alwin, the purpose of the follow-up x-ray was to determine whether plaintiff's pneumonia caused the spot. If not, further testing would be necessary to determine the cause of the spot. Dr. Alwin sent Dr. Benn plaintiff's file and a note regarding the radiologist's interpretation of the chest x-ray.

On July 28, plaintiff called Dr. Benn and told him that a dark spot had been found on her chest x-ray. Instead of ordering an additional x-ray, Dr. Benn advised plaintiff to sign an authorization for the release of chest x-rays taken previously at her former physician's office in order to see whether the spot was present on the previous x-rays. Between July 28, 1999, and September 1, 1999, Dr. Benn's office contacted plaintiff's former physician in an attempt to obtain plaintiff's previous x-rays. On August 31, 1999, Benn determined that plaintiff should come to his office for a follow-up x-ray because he had not yet received the chest x-rays.

On September 1, 1999, Dr. Benn's office sent plaintiff a letter advising her that she needed a follow-up x-ray. Plaintiff had not heard from any of her doctors since August 1. Dr. Benn made this recommendation after receiving the report from Dr. Alwin regarding plaintiff's visit to the

emergency room. Dr. Benn believed the spot was likely the result of pneumonia, but because of plaintiff's history of smoking, he considered her a high risk for lung cancer. Dr. Benn wanted to make sure that the spot was related to pneumonia and not lung cancer. According to Dr. Benn, a follow-up x-ray would show whether the spot had disappeared or whether further testing would be necessary to determine the cause of the spot. The letter mentioned the possibility of cancer, which was the first time "cancer" had been communicated to plaintiff. Plaintiff received the letter on or about September 2.

On September 10, 1999, plaintiff underwent a follow-up x-ray that showed that the spot was unchanged. On or around September 17, 1999, plaintiff underwent a CAT scan, which is a common procedure for ruling out the possibility of cancer when a chest x-ray shows an area that raises the suspicion of cancer. On September 22, plaintiff underwent a biopsy of the affected area. On October 14, 2001, she underwent surgery to remove the affected lobe of her lung. Currently, she has "stage four" lung cancer. Plaintiff's doctors told her that the size of the tumor suggested that the cancer had been growing for about two years before it was discovered. In Dr. Benn's opinion, plaintiff had cancer when she went to the emergency room on July 28, 1999.

### D. Plaintiff's Claim for Long–Term Disability Benefits

October 10, 1999, was plaintiff's last day of work. Plaintiff has been unable to work from October 10, 1999, to at least November 1, 2001, with the exception of a few days in April 2000, when she tried to return to work.

In May 2000, plaintiff filed a claim with defendant, asserting that she had a total disability because of her lung cancer and seeking long-term disability benefits under

the policy. Plaintiff's husband began contacting defendant to see when plaintiff could expect to begin receiving her disability benefits. Defendant's claim representative told him that plaintiff should receive a check in one or two weeks. After a couple of weeks, plaintiff had not received a check. When plaintiff's husband called defendant, a claim representative told him that defendant had no file in plaintiff's name. Defendant turned the matter over to one of its claims processors, Sheilah Andrade, who asked that plaintiff resubmit her application for benefits.

According to defendant's file activity sheet regarding plaintiff's claim for benefits, on May 24, 2000, Andrade began reviewing plaintiff's file, noting that a pre-existing condition was a possibility. On June 13, 2000, Andrade contacted plaintiff's doctor to request plaintiff's records, plaintiff's employer to obtain additional information regarding plaintiff's eligibility for benefits and plaintiff to inform her why the claim was still pending. On June 21, Andrade received information from plaintiff's employer and called plaintiff's doctor to obtain plaintiff's medical records. On June 29, Andrade called plaintiff's doctor again regarding her medical records.

In late June 2000, plaintiff contacted Andrade to see whether her application was being processed.

According to defendant's activity file sheet on plaintiff, on July 10, 2000, plaintiff's doctor called Andrade, asking that she send another authorization for release of medical records, which Andrade did. On July 13, Andrade received and reviewed plaintiff's medical records. Andrade discussed the issue of a pre-existing condition with one of defendant's nurse case managers. They concluded that plaintiff's lung cancer was pre-existing.

In a letter dated July 13, 2000, defendant denied plaintiff's claim for benefits on the ground that her lung cancer was a pre-existing condition and, therefore, that her disability was excluded from coverage.

## OPINION

### A. Breach of Contract

It is common for health and long-term disability insurance policies to exclude the treatment of pre-existing conditions from coverage. Although the definition of "pre-existing condition" can vary, the policy reasons for enforcing pre-existing condition exclusions are uniform. First, losses stemming from pre-existing conditions are not fortuitous. Jeffrey W. Stempel, Law of Insurance Contract Disputes § 22.10 (2d ed.2000). In the case of a true pre-existing condition, the insured knows that she will be incurring losses because of the condition. Second, losses stemming from pre-existing conditions have the potential of undermining the insurer's risk pool. Id. If an insured does not disclose to the insurer that she has a pre-existing condition when applying for coverage, the insurer cannot calculate its potential liability accurately. Finally, such losses create problems of adverse selection. Id. An insured who has been diagnosed with a condition could apply for insurance without revealing the condition, costing the insurer more than it had anticipated.

Although these policy concerns are economically sound, extending pre-existing condition exclusions too far has a deleterious effect on the insured. If undergoing a standard diagnostic test before the effective date of a policy could be considered receiving treatment for a pre-existing condition, individuals could be discouraged from seeking preventive medical care. If an insurer can point to pre-coverage symptoms that turn out to be consistent with a condition diagnosed after coverage becomes effective, any prior symptoms not inconsistent with the ultimate diagnosis could become a ground for denying bene-

fits. *Ermenc v. American Family Mutual Ins. Co.,* 221 Wis.2d 478, 484, 585 N.W.2d 679, 682 (Ct.App.1998). Similarly, if an insurer can point to the fact that doctors suspected a condition before an effective date because of certain risk factors, such as a history of smoking, the definition of pre-existing condition would become so broad as to make the term meaningless. *Id.* For example, it is likely that any doctor would suspect cancer as a possible cause of respiratory problems in a heavy smoker. It would be absurd to find this suspicion sufficient to deny coverage of all subsequent treatment on the ground that cancer is a pre-existing condition. Because "[i]nsurance contracts should be given a reasonable interpretation and not one that leads to an absurd result," *id.* (citing *City of Edgerton v. General Casualty Co.,* 172 Wis.2d 518, 551–52, 493 N.W.2d 768, 782 (Ct.App.1992)), these policy concerns demand that pre-existing condition exclusions not be read too broadly.

█ Under the terms of plaintiff's policy in this case, a pre-existing condition is "a condition for which medical treatment or advice was rendered, prescribed or recommended within three months prior to [the insured's] effective date of insurance." The central issue is whether plaintiff's lung cancer constitutes a pre-existing condition under plaintiff's policy, which both parties agree became effective on September 1, 1999. Under Wisconsin law, the insured has the initial burden of proving coverage and the insurer has the burden of proving any exception to coverage. *Glassner v. Detroit Fire & Marine Ins. Co.,* 23 Wis.2d 532, 536–37, 127 N.W.2d 761, 764 (1964).

The parties do not dispute that in a federal diversity action involving an insurance dispute, the substantive law of the forum state applies. *See Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Few Wisconsin courts have addressed the issue of the denial of benefits under a pre-existing condition exclusion. In *Ermenc,* 221 Wis.2d 478, 585 N.W.2d 679, the leading Wisconsin case on the coverage of pre-existing condition exclusions, the Wisconsin Court of Appeals held that the insured's cancer was not a pre-existing condition despite pre-existing symptoms. *Id.* at 486, 585 N.W.2d at 683. Although defendant tries to distinguish *Ermenc,* I find the reasoning dispositive.

In *Ermenc,* the insured went to her doctor because of abdominal pain in May of 1996. The doctor diagnosed epigastric pain, prescribed medication and told Ermenc to return for follow-up tests if her condition did not improve. *Id.* at 480, 585 N.W.2d at 680. Four days later, Ermenc went to the emergency room, was diagnosed with probable peptic ulcer disease and was sent home with more medication. The doctors did not suspect cancer. Ermenc purchased a short-term health insurance policy that became effective on June 18, 1996. On June 27, 1996, Ermenc was admitted to the hospital, where her doctor discovered a palpable mass in her stomach. Further testing led to a diagnosis of cancer. *Id.*

The court reasoned that although Ermenc sought treatment for symptoms likely caused by cancer before the effective date of her policy, it was not known until after the effective date that she had cancer. *Id.* at 483, 585 N.W.2d at 681. Ermenc's symptoms were non-specific and could have been caused by a variety of conditions. *Id.* at 485–86, 585 N.W.2d at 682. The fact that Ermenc had experienced symptoms that later proved consistent with cancer was insufficient to support a denial under the pre-existing condition clause. *Id.* at 484, 585 N.W.2d at 682. "In order to avoid liability, the insurer must prove that the claimant was

treated for the same condition before and after the policy took effect." *Id.* at 486, 585 N.W.2d at 682. Finally, relying on notions of public policy, the court noted that to "permit such backward-looking reinterpretation of symptoms to support claims denials would so greatly expand the definition of pre-existing condition as to make that term meaningless: any prior symptom not inconsistent with the ultimate diagnosis would provide a basis for denial." *Id.* at 484, 585 N.W.2d at 682 (citing *City of Edgerton,* 172 Wis.2d 518, 551–52, 493 N.W.2d 768, 782).

■ The facts of this case are similar to those in *Ermenc.* Before the effective date of her policy, plaintiff went to the emergency room complaining of chest pain, shortness of breath and numbness in her left arm and was diagnosed as having pneumonia, tachycardia and asthma. X-rays taken that day revealed a spot on her lung that could have resulted from several conditions, including pneumonia or cancer. The radiologist who interpreted the x-ray recommended a follow-up x-ray to determine whether the spot was caused by pneumonia. If not, further testing would be necessary to determine the cause of the spot and to rule out cancer. After the effective date of plaintiff's insurance policy, plaintiff's primary physician ordered follow-up x-rays and tests that led to a diagnosis of lung cancer.

The only material difference between the facts in this case and those in *Ermenc* is that here, plaintiff's doctors suspected cancer before the effective date. Defendant relies heavily on this fact, asserting that the fact that Ermenc's doctors did not suspect cancer led the court to conclude that they did not give her advice about cancer or treat her for it. However, in neither case did the doctors make a diagnosis of cancer before the effective date. In plaintiff's case, the doctors narrowed the possible diagnoses to a handful of conditions, one of which was cancer; they did not order the follow-up x-rays solely to rule out the possibility of cancer. Moreover, the facts suggest that even if the emergency room doctors had not suspected cancer, they would have ordered the same sequence of x-rays in order to track plaintiff's pneumonia. Because plaintiff had been a smoker for many years, she had a high risk factor for lung cancer, making it an obvious condition to suspect. As in *Ermenc,* plaintiff's symptoms that manifested before the effective date were non-specific and could have been caused by a variety of conditions. Defendant has not shown that plaintiff was treated for lung cancer both before and after the effective date of plaintiff's policy, or that she was given advice about cancer before the effective date. *Id.* at 486, 585 N.W.2d at 682. Taking all facts in the light most favorable to the non-moving party, I conclude that defendant has failed to establish that plaintiff's cancer was a condition for which "medical treatment or advice was rendered, prescribed or recommended" in the three months before the policy took effect.

Policy considerations reinforce the conclusion that plaintiff did not receive treatment or advice for cancer before the effective date of her policy. None of the concerns that weigh in favor of enforcing pre-existing condition clauses come into play. Neither plaintiff nor her doctors knew that she had cancer before the effective date of her policy; she did not discover that she had cancer and then purchase a long-term disability policy from defendant. Although the cost of providing long-term disability insurance to plaintiff may cost defendant more than it had anticipated, this circumstance is not through any fault of plaintiff. It falls instead to the insurer and its risk pool.

In contrast, policy considerations that weigh in favor of protecting the insured do

come into play. When plaintiff underwent a chest x-ray at the emergency room and when the emergency room doctors recommended a follow-up x-ray, they were following standard diagnostic procedures, which should not be discouraged. Although the doctors suspected that the spot on plaintiff's lung could result from cancer, this suspicion was based, in part, on plaintiff's history as a smoker, which put her at greater risk for lung cancer. Individuals should not be denied coverage because they carry risk factors that make them more prone to certain health conditions that, in turn, make a doctor more suspicious of these ailments. Instead, insurers should (and do) consider such risk factors when computing insurance premiums.

Defendant argues that *Ermenc* is of limited value because of factual distinctions but that other jurisdictions have had the occasion to interpret pre-existing condition exclusions under circumstances that are more similar to the facts of this case. *See, e.g., Bullwinkel v. New England Mutual Life Ins. Co.,* 18 F.3d 429 (7th Cir.1994) (ERISA case applying ordinary principles of contract construction); *McWilliams v. Capital Telecommunications Inc.,* 986 F.Supp. 920 (M.D.Pa.1997) (same); *Bergan v. Time Ins. Co.,* 196 Ga.App. 78, 395 S.E.2d 361 (1990) (interpreting Georgia law). In each of these cases, a suspicious tumor or mass was discovered and follow-up procedures were ordered before the effective date of the insured's policy, but the mass was not determined to be malignant until after the effective date. None of the cases that defendant cites interprets Wisconsin law and each of the cases is distinguishable on the facts.

In *Bullwinkel,* 18 F.3d at 429, the Court of Appeals for the Seventh Circuit noted that an ultrasound of a suspicious breast lump that the plaintiff received before the effective date of her policy actually related to breast cancer, a pre-existing condition.

The plaintiff's doctors suspected cancer and performed the ultrasound in order to rule out cancer. Similarly, in *McWilliams,* 986 F.Supp. at 925, a district court in Pennsylvania found that the treatment that the plaintiff received before the effective date of her policy was directed at determining whether the lump in her breast was cancerous. In contrast, in plaintiff's case, the spot on her lung could have resulted from many conditions, including the pneumonia with which plaintiff was diagnosed. The x-ray and the recommendation to undergo a follow-up x-ray that took place before the policy's effective date were not given solely to determine whether plaintiff had cancer but to confirm the diagnosis of pneumonia and, potentially, to rule out cancer. In addition, in *Ermenc,* 221 Wis.2d at 484, 585 N.W.2d at 682, the court disapproved of an insurance company using subsequent events to characterize symptoms occurring before an effective date as consistent with the ultimate diagnosis when many conditions are consistent with the symptoms.

In *Bergan,* 395 S.E.2d at 362, a Georgia court of appeals concluded summarily that the plaintiff's ovarian cancer constituted a pre-existing condition. Before the effective date of the plaintiff's policy, her doctor had discovered a large, palpable mass in her abdomen, performed an ultrasound and recommended an exploratory laparotomy. *Id.* The laparotomy revealed ovarian cancer after the effective date of the plaintiff's policy. The plaintiff's doctor never diagnosed her with a condition other than cancer; instead, after the doctor discovered the palpable mass, all further advice focused on resolving its cause. *Id.* In contrast, in this case, plaintiff's symptoms were consistent with many different conditions, including three with which plaintiff was diagnosed originally: pneumonia, tachycardia and asthma.

In contrast to the cases cited by defendant, other federal and state cases support plaintiff's position. For example, in *Pitcher v. Principal Mutual Life Ins. Co.*, 93 F.3d 407, 417 (7th Cir.1996), the Court of Appeals for the Seventh Circuit found that the fact that the plaintiff had received a routine physical examination and mammogram before the effective date of her policy did not constitute "treatment or service" for the ultimate diagnosis of breast cancer. The plaintiff's doctor discovered suspicious lumps in the plaintiff's breasts that were consistent with her fibrocystic breast condition. *Id.* at 409. When the lumps did not disappear after several weeks, the doctor ordered a mammogram that revealed a suspicious mass. After the effective date, the plaintiff underwent a biopsy that revealed a malignant tumor. *Id.*

Defendant asserts that the facts in Pitcher are distinguishable because that policy did not include "advice" in its pre–existing condition exclusion, whereas in this case, plaintiff received "advice" for lung cancer when the emergency room doctors recommended that she undergo a follow-up x-ray. However, following the reasoning in *Ermenc*, plaintiff's emergency room symptoms were consistent with several different conditions and not solely with lung cancer. The x-ray taken at the emergency room was not ordered in relation to plaintiff's cancer but to confirm her pneumonia. The follow-up x-ray was advised in order to determine whether the spot was caused by the pneumonia with which plaintiff had been diagnosed. If the follow-up x-ray showed the spot persisting, further tests would have to be performed in order to rule out cancer. Although plaintiff's policy includes the additional term "advice," this is a distinction without a material difference that does not make the reasoning in *Pitcher* inapplicable to this case. Instead, I find the court of appeals' reasoning persuasive.

Although I have already determined that the reasoning in *Ermenc* is persuasive, it is true that *Ermenc* was decided by a court of appeals rather than by the Wisconsin supreme court. When there is no state supreme court precedent on point, a federal court sitting in diversity predicts how the state's supreme court would likely decide the issue. *See Commissioner of Internal Revenue v. Bosch's Estate*, 387 U.S. 456, 465, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967). The federal court takes into consideration lower state court decisions, if any, but is not bound to apply and follow these decisions if it believes that they would not be affirmed by the state's supreme court. *See id.* ("[T]he State's highest court is the best authority on its own law. If there be no decision by that court then federal authorities must apply what they find to be the state law after giving 'proper regard' to relevant rulings of other courts of the State. In this respect, it may be said to be, in effect, sitting as a state court."). Because of the factual similarities between *Ermenc* and this case, I find the reasoning in *Ermenc* to be the best indicator of how the Wisconsin Supreme Court would likely decide the issue.

### B. *Bad Faith Denial*

To prevail on a claim for bad faith, an insured must establish that (1) there was no reasonable basis for denying the claim under an objective standard and (2) the insurer acted with knowledge or reckless disregard for the lack of a reasonable basis. *Anderson v. Continental Ins. Co.*, 85 Wis.2d 675, 692, 271 N.W.2d 368, 377 (1978). As evidence of a reasonable basis, it is relevant to examine whether a claim was investigated appropriately and whether the results of the investigation were evaluated and reviewed reasonably. *Id.* When an insured's claim is "fairly debatable" either in fact or law, an insurer

cannot be said to have denied the claim in bad faith. *Id.* at 691, 271 N.W.2d at .376.

Defendant seeks summary judgment on plaintiff's bad faith claim on one ground only: because there is no coverage for plaintiff's pre-existing condition, defendant could not have denied plaintiff's claim in bad faith. This circular argument does not advance defendant's argument. I have already determined that the undisputed facts establish that plaintiff did not receive advice or treatment for lung cancer before the effective date. However, because I find that the law addressing pre-existing condition clauses is "fairly debatable," defendant's denial of coverage cannot be characterized as a bad faith denial.

Although the undisputed facts are insufficient to establish that defendant investigated plaintiff's claim reasonably, this lack of evidence is not fatal to defendant's argument. On the basis of the undisputed facts surrounding plaintiff's medical treatment as applied to case law, it is "fairly debatable" whether plaintiff's lung cancer constituted a pre-existing condition. Although I am not convinced by the factual distinctions that defendant tries to draw between the facts of this case and those in *Ermenc,* 221 Wis.2d 478, 585 N.W.2d 679, there is room to argue that the two cases are distinguishable. In addition, the survey of federal and state court cases that the parties undertook demonstrates that other jurisdictions have reached different conclusions on the basis of arguably similar facts. *See, e.g., Pitcher,* 93 F.3d at 417 (finding pre-existing condition clause did not apply when ultrasound of breast lump performed before effective date); *cf. Bullwinkel,* 18 F.3d at 429 (finding pre-existing condition clause did apply when ultrasound of breast lump performed before effective date). Because there is an arguable basis for distinguishing *Ermenc* and other jurisdictions have found pre-existing condition clauses to apply in rela-

tively similar circumstances, I conclude that plaintiff's claim for coverage was "fairly debatable," precluding a finding that defendant denied coverage in bad faith. Defendant's motion for summary judgment as to this claim will be granted.

### C. *Interest under Wis.Stat. § 628.46*

Under Wis.Stat. § 628.46, an insurer must pay insurance claims promptly. Unless the insurer has "reasonable proof" to establish that it is not responsible for the payment, the insurer must pay interest at 12% on overdue payments. Wis.Stat. § 628.46(1); *see also United States Fire Ins. Co. v. Good Humor Corp.,* 173 Wis.2d 804, 835, 496 N.W.2d 730, 741 (Ct.App. 1993) (because issues complex and Wisconsin law not on point, interest denied under § 628.46). Defendant relies exclusively on case law, asserting that because it is possible to analogize the facts underlying plaintiff's claim to facts in cases from other jurisdictions with favorable outcomes, defendant had reasonable proof that it was not responsible for paying plaintiff's claim. However, unlike the issues in *United States Fire,* the issue in this case is not complex and there is Wisconsin law on point. Because the law does not provide defendant a basis for reasonable proof, I turn to the facts available to defendant at the time the decision was made to deny coverage. The undisputed facts reveal only that defendant's claims agent obtained plaintiff's medical and employment records and discussed them with defendant's in-house nurse. Although I found that plaintiff's claim for benefits was "fairly debatable" under the law, the undisputed facts are not sufficient to establish that defendant had reasonable proof that it was not responsible for payment of plaintiff's claim. Accordingly, defendant's motion for summary judgment on plaintiff's claim for interest under Wis.Stat. § 628.46 will be denied.

## ORDER

IT IS ORDERED that with respect to plaintiff's breach of contract claim, defendant Continental Casualty Company's motion for summary judgment is DENIED and, on the court's own motion, summary judgment is GRANTED to plaintiff Valerie K. Hall. Defendant's motion for summary judgment is GRANTED as to plaintiff's claim for bad faith denial of coverage and DENIED as to plaintiff's claim for interest under Wis.Stat. § 628.46. Trial will be limited to the issues of (1) damages incurred as a result of defendant's improper denial of plaintiff's long-term disability benefits and (2) whether defendant had reasonable proof that it was not responsible for payment of plaintiff's claim for benefits.